Mr. Justice Clark,
whom Mr. Justice Harlan and Mr. Justice White join,
dissenting.
The appellant, a derivative citizen since 1950, has voluntarily absented herself from the United States for over a decade, living in her native Germany for the last eight years. In 1956 she married a German citizen there; she has since borne four (German national) sons there, and now says she has no intention to return to the United States.
I, too, sympathize with the appellant for the dilemma in which she has placed herself through her marriage to a foreign citizen. But the policy of our country is involved here, not just her personal consideration. I cannot say that Congress made her a second-class citizen by enacting § 352 (a)(1) of the Immigration and Nationality Act of 1952, 66 Stat. 269, 8 U. S. C. § 1484, placing a “badge of lack„of allegiance” upon her because she chose to live permanently abroad in her native land. If there is such a citizenship or badge, appellant, not the Congress, created it through her own actions. All that Congress did was face up to problems of the highest national importance by authorizing expatriation, the only adequate remedy. Appellant, with her eyes open to the result, chose by her action to renounce her derivative citizenship. Our cases have so interpreted such action for half *302 a century. Mackenzie v. Hare, 239 U. S. 299 (1915). As applied to her I cannot say, as does the Court, that the command of Congress in §352 (a)(1) is discriminatory and, therefore, violative of due process. Mackenzie decided just the contrary, upholding a statute which provided that, although an American male did not suffer loss of citizenship during marriage to a foreign citizen, an American woman did. Here the appellant had statutory notice of the requirement; she voluntarily acted in disregard of it for eight years, intends to continue to do so, and in my view has therefore renounced her citizenship.
I.
There is nothing new about the practice of expatriating naturalized citizens who voluntarily return to their native lands to reside. It has a long-established and widely accepted history. Our concept of citizenship was inherited from England and, accordingly, was based on the principle that rights conferred by naturalization were subject to the conditions reserved in the grant. See Calvin’s Case, 7 Co. Rep. 1 a, 77 Eng. Rep. 377 (1608). It was with this in mind that the Founders incorporated Art. I, § 8, cl. 4, into our Constitution. This clause grants Congress the power “[t]o establish an uniform Rule of Naturalization . . . .” And,- as Madison himself said, these words meant that the “Natl. Legislre. is to have the right of regulating naturalization, and can by virtue thereof fix different periods of residence as conditions of enjoying different privileges of Citizenship . . . .” II Farrand, The Records of the Federal Convention of 1787, 235 (1911). This was confirmed during the debate in the First Congress on the first naturalization bill when Alexander White of Virginia suggested that if the residence requirement were stricken, “another clause ought to be added, depriving [naturalized] persons of the privilege of citizenship, who left the country and staid abroad for a given *303 length of time.” 1 Annals of Congress 1110 (1790). James Madison answered:
“It may be a question of some nicety, how far we can make our law to admit an alien to the right of citizenship, step by step; but there is no doubt we may, and ought to require residence as an essential.” Id., at 1112.
The records show not only that it was the consensus of the members of the House that step-by-step naturalization was permissible but also that not a word was spoken against the Madison statement that required residence was constitutionally allowed. This debate points up the fact that distinctions between naturalized and native-born citizens were uppermost in the minds of the Framers of the Constitution.
' The right to renounce citizenship acquired at birth was a serious question during the War of 1812. In 1814 the Government, through Secretary of State Monroe, circulated an anonymous pamphlet, A Treatise on Expatriation, which declared that “[expatriation . . . is nothing more than emigration, with an intention to settle permanently abroad.” At 21. Since that time it has traditionally been our policy to withdraw diplomatic protection from naturalized citizens domiciled in their native states. See, e. g., letter from Secretary of State Adams to Shaler (1818), III Moore, Digest of International Law 735-736 (1906); letter from United States Minister to Prussia Wheaton to Knoche (1840), S. Exec. Doc. No. 38, 36th Cong., 1st Sess., 6-7; letter from Secretary of State Fish to Wing (1871), II Wharton, Digest of International Law of the United States 361-362 (2d ed. 1887) ; communication from Secretary of State Hay to American diplomats (1899), III Moore, supra, at 950. During all this period the United States protected all citizens abroad except naturalized ones residing in their *304 native lands. In 1868 the Bancroft treaty was negotiated with the North German Confederation. It provided that each country would recognize naturalization of its native-born citizens by the other country. It further provided that “[i]f a German naturalized in America renews his residence in North Germany, without the intent to return to America, he shall be held to have renounced his naturalization . . . [and] [t]he intent not to return may be held to exist when the person naturalized in the one country resides more than two years in the other country.” ' 15 Stat. 615, 616-617. The United States has similar rights under existing treaties with 20 countries. All of these rights will be stricken by the decision today.
In the late nineteenth century the Government adopted a practice of informing naturalized citizens residing in their native lands without intent to return that they had expatriated themselves. The doctrine underlying this procedure has since been followed on several occasions by commissions arbitrating the claims of American citizens against foreign governments. See III Moore, History and Digest of International Arbitrations 2562-2572, 2579-2581 (1898).
As early as 1863 President Lincoln had suggested to Congress that it “might be advisable to fix a limit beyond which no citizen of the United States residing abroad may claim the interposition of his Government.” 7 Messages and Papers of the Presidents 3382 (Richardson ed. 1897). However, no legislation was enacted in the nineteenth century. In 1906, at the request of Congress, Secretary of State Elihu Root appointed a “citizenship board” to consider this and other related matters. The Board’s report stated:
“Expressed renunciation of American citizenship is, however, extremely rare; but the class of Americans who separate themselves from the United States *305 and live within the jurisdiction of foreign countries is becoming larger every year, and the question of their protection causes increasing embarrassment to this Government in its relations with foreign powers.” H. Doc. No. 326, 59th Cong., 2d Sess., 25.
The Board’s recommendations led to the enactment of the Nationality Act of 1907, 34 Stat. 1228. That Act included a rebuttable presumption that residence for two years in the foreign state from which a naturalized American citizen came constituted a forfeiture of American citizenship. This provision proved difficult to administer and in 1933 President Roosevelt appointed a cabinet committee (the Secretary of State, the Attorney General and the Secretary of Labor) to review the nationality laws. The committee issued an extensive report and draft statute which provided for expatriation of naturalized citizens who resided continuously in their country of origin for three years. This provision was incorporated into the Nationality Act of 1940, 54 Stat. 1137,1170, and was carried over into the Immigration and Nationality Act of 1952, modified so as not to require “uninterrupted physical presence in a foreign state 66 Stat. 163, 170, 269.
II.
This historical background points up the international difficulties which led to the adoption of the policy announced in § 352 (a)(1). Residence of United States nationals abroad has always been the source of much international friction and the ruling today will expand these difficulties tremendously. In 1962 alone 919 persons were expatriated on the basis of residence in countries of former nationality. The action of the Court in voiding these expatriations will cause no end of difficulties because thousands of persons living throughout the world will come under the broad sweep of the Court’s *306 decision. It is estimated that several thousand of these American expatriates reside in iron curtain countries alone. Hearings before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary on S. Res. 49, 85th Cong., 1st Sess., 133. The protection of American citizens abroad has always been a most sensitive matter and continues to be so today. This is especially true in Belgium, Greece, France, Iran, Israel, Switzerland and Turkey, because of their refusal to recognize the expatriation of their nationals who acquire American citizenship. The dissension that springs up in some of these areas adds immeasurably to the difficulty.
Nor is the United States alone in making residence abroad cause for expatriation. Although the number of years of foreign residence varies from 2 to 10 years, 29 countries, including the United Kingdom and 7 Commonwealth countries, expatriate naturalized citizens residing abroad. Only four — Czechoslovakia, Poland, Afghanistan, and Yugoslavia — apply expatriation to both native-born and naturalized citizens. Even the United Nations sanctions different treatment for naturalized and native-born citizens; Article 7 of the United Nations Convention on the Reduction of Statelessness provides that naturalized citizens who reside abroad for seven years may be expatriated unless they declare their intent to retain citizenship.
III.
The decisions of this Court have consistently approved the power of Congress to enact statutes similar to the one here stricken down. Beginning with Mackenzie v. Hare, supra, where the Court sustained a statute suspending during coverture the citizenship of a native-born American woman who married a foreigner, the Court has invariably upheld expatriation when there is a concurrence on the part of the citizen. In Mackenzie exactly the *307 same argument was made that appellant urges here. Indeed, the Court uses the same opinion in this case to strike down § 352 (a)(1) as was urged in Mackenzie, namely, Osborn v. Bank of the United States, 9 Wheat. 738 (1824), where Chief Justice Marshall remarked: “The constitution does not authorize Congress to enlarge or abridge . . . [the] rights” of citizens. At 827. But the Court in Mackenzie, without dissent on the merits, held:
“It may be conceded that a change of citizenship cannot be arbitrarily imposed, that is, imposed without the concurrence of the citizen. The law in controversy does not have that feature. It deals with a condition voluntarily entered into [marriage], with notice of the consequences. We concur with counsel that citizenship is of tangible worth, and we sympathize with plaintiff in her desire to retain it and in her earnest assertion of it. But there is involved more than personal considerations. As we have seen, the legislation was urged by conditions of national moment. . . . This is no arbitrary exercise of government. It is one which, regarding the international aspects, judicial opinion has taken for granted would not only be valid but demanded.” At 311-312.
And later in Savorgnan v. United States, 338 U. S. 491 (1950), we approved the doctrine of Mackenzie, supra. Six years ago in Perez v. Brownell, 356 U. S. 44 (1958), we held that an American citizen voting in a foreign election expatriated himself under § 401 of the Nationality Act of 1940, 54 Stat. 1137. We again cited Mackenzie, supra, with approval, describing the central issue in expatriation cases
“as importing not only something less than complete and unswerving allegiance to the United States but *308 also elements of an allegiance to another country in some measure, at least, inconsistent with American citizenship.” At 61.
The present case certainly meets this test. Appellant’s prolonged residence in her former homeland, the allegiance her husband and children owe to it, and her intention not to return to the United States all show some measure of allegiance to Germany. At the very least, these factors show much less than “unswerving allegiance to the United States” and are “inconsistent with American citizenship.” Indeed, in this respect the instant case is much stronger than Mackenzie, supra.
The Court bases its decision on the fact that § 352 (a)(1) applies only to naturalized, not native-born, citizens. It says this results in a discrimination in violation of the Due Process Clause of the Fifth Amendment. I think that in so doing the Court overspeaks itself. If Congress has the power to expatriate all citizens, as the Court’s position implies, it would certainly have like power to enact a more narrowly confined statute aimed only at those citizens whose presence in their native homelands can embroil the United States in conflict with such countries. As the history shows, the naturalized citizen who returns to his homeland is often the cause of the difficulties. This fact is recognized by the policy of this country and of 25 others and by a United Nations Convention as well. Through § 352 (a)(1), Congress has restricted its remedy to correction of the precise situations which have caused the problem. In adopting the classification “naturalized citizen” has the Congress acted with reason? Many times this Court has upheld classifications of more significance. Hirabayashi v. United States, 320 U. S. 81 (1943) (curfew imposed on persons of Japanese ancestry, regardless of citizenship, in military areas during war); Heim v. McCall, 239 U. S. 175 (1915) (aliens not employable on public works projects); Ter *309 race v. Thompson, 263 U. S. 197 (1923) and Porterfield v. Webb, 263 U. S. 225 (1923) (aliens who were ineligible for citizenship not permitted to hold land for farming or other purposes); Ohio ex rel. Clarke v. Deckebach, 274 U. S. 392 (1927) (aliens not permitted to conduct pool and'billiard rooms). As in Mackenzie v. Hare, supra, these cases were sustained on the basis that the classification was reasonably devised to meet a demonstrated need. Distinctions between native-born and naturalized citizens in connection with foreign residence are drawn in the Constitution itself. Only a native-born may become President, Art. II, § 1. A naturalized citizen must wait seven years after he obtains his citizenship before he is eligible to sit in the House, Art. I, § 2. For the Senate, the waiting period is nine years, Art. I, § 3. Do these provisions create a second-class citizenship or place a “badge of lack of allegiance” on those citizens? It has never been thought so until today. As I have shown, in the debate in the First Congress on the first naturalization bill, it was proposed to expatriate naturalized citizens who resided abroad. During the entire nineteenth century only naturalized citizens were, as a general rule, expatriated on the grounds of foreign residence, and for nearly 100 years our naturalization treaties have contained provisions authorizing the expatriation of naturalized citizens residing in their native lands. Indeed, during the consideration of the 1952 Act, not a single witness specifically objected to § 352 (a)(1). Even the Americans for Democratic Action suggested that it was a reasonable regulation. It is a little late for the Court to decide in the face of this mountain of evidence that the section has suddenly become so invidious that it must be stricken as arbitrary under the Due Process Clause.
Kennedy v. Mendoza-Martinez, 372 U. S. 144 (1963), is not apposite. There expatriation for the offense of remaining outside the country to avoid military service *310 was held to constitute punishment without a criminal trial. The majority here indicates that a reservation made by MR. Justice Stewart in his dissent in that case supports its present view. I think not. Indeed, my Brother Stewart’s conclusion that our cases “upholding involuntary denationalization all involved conduct inconsistent with undiluted allegiance to this country,” at 214, fits this case like a glove. Here appellant has been away from the country for 10 years, has married a foreign citizen, has continuously lived with him in her native land for eight years, has borne four sons who are German nationals, and admits that she has no intention to return to this country. She wishes to retain her citizenship on a standby basis for her own benefit in the event of trouble. There is no constitutional necessity for Congress to accede to her wish.
I dissent.