## SAVORGNAN *v.* UNITED STATES ET AL.

No. 48.  Argued November 7–8, 1949.—Decided January 9, 1950.

*Suel O. Arnold* and *Carl A. Flom* argued the cause and filed a brief for petitioner.

*Oscar H. Davis* argued the cause for respondents. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Campbell, Robert S. Erdahl* and *Philip R. Monahan.*

Briefs of *amici curiae* urging reversal were filed by *Walbridge S. Taft* for Margaret Trimble Revedin, and by *Jack Wasserman* and *Gaspare Cusumano* for the Association of Immigration and Nationality Lawyers.

MR. JUSTICE BURTON delivered the opinion of the Court.

The question is whether, under the special circumstances of this case, a native-born American citizen who became an Italian citizen in 1940, and lived in Italy with her Italian husband from 1941 to 1945, nevertheless retained her American citizenship. For the reasons hereinafter stated, we hold that she did not. The controlling statutes are § 2 of the Citizenship Act of 1907,[1] and §§ 401,

---

[1] "SEC. 2. *That any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state.*

"When any naturalized citizen shall have resided for two years in the foreign state from which he came, or for five years in any

403 and 104 of its successor, the Nationality Act of 1940.[2]

The petitioner, Rosette Sorge Savorgnan, brought this action in the United States District Court for the Western

other foreign state it shall be presumed that he has ceased to be an American citizen, and the place of his general abode shall be deemed his place of residence during said years: *Provided, however, That* such presumption may be overcome on the presentation of satisfactory evidence to a diplomatic or consular officer of the United States, under such rules and regulations as the Department of State may prescribe: *And provided also,* That no American citizen shall be allowed to expatriate himself when this country is at war." (Emphasis supplied.) 34 Stat. 1228, 8 U. S. C. (1934 ed.) § 17.

[2] "SEC. 401. A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"(a) *Obtaining naturalization in a foreign state,* either *upon his own application* or through the naturalization of a parent having legal custody of such person: . . . or

"(b) *Taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state; . . . ."* (Emphasis supplied.) 54 Stat. 1168–1169, 8 U. S. C. § 801 (a) and (b).

"SEC. 403. (a) Except as provided in subsections (g), (h), and (i) of section 401, no national can expatriate himself, or be expatriated, under this section[*] while within the United States or any of its outlying possessions, but expatriation shall result from the performance within the United States or any of its outlying possessions of any of the acts or the fulfillment of any of the conditions specified in this section[*] *if and when the national thereafter takes up a residence abroad."* (Emphasis supplied.) 54 Stat. 1169–1170, 58 Stat. 677, 8 U. S. C. § 803 (a).

"SEC. 104. For the purposes of sections 201, 307 (b), *403,* 404, 405, 406, and 407 of this Act, *the place of general abode shall be deemed the place of residence."* (Emphasis supplied.) 54 Stat. 1138, 8 U. S. C. § 504.

*The words "this section" as used in § 403 refer to § 401. This not only is evident from the context but a ready explanation appears from the fact that the language of § 403 originally appeared as a proviso in § 401 (h) of H. R. 6127, 76th Cong., 1st Sess. (1940). Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, superseded by H. R. 9980, 76th Cong., 1st Sess. 25 (1940). H. R. 9980 became the Nationality Act of 1940.

District of Wisconsin, under § 503 of the Nationality Act of 1940, 54 Stat. 1171, 8 U. S. C. § 903, for a judgment declaring her to be an American citizen. That court decided in her favor. 73 F. Supp. 109. The United States Court of Appeals for the Seventh Circuit reversed the judgment and remanded the case with directions to dismiss the petition against the United States because it had not consented to be sued, and to enter judgment in favor of the other defendants in conformity with its opinion. 171 F. 2d 155. Because of the importance of this decision in determining American citizenship, we granted certiorari. 337 U. S. 914.

Insofar as material, the undisputed facts and those found by the District Court are as follows:

The petitioner was born in Wisconsin in 1915 of native-born parents and resided in the United States until July, 1941. In March, 1940, her intended husband, Alessandro Savorgnan, was an Italian citizen, serving as Italian Vice Consul at St. Louis, Missouri. He informed her that, under Italian law, she would have to become an Italian citizen before he could obtain the necessary royal consent to their marriage. She applied for Italian citizenship. He prepared her application. It was in Italian which he understood, but which she did not understand. In August, the petitioner was granted Italian citizenship. In November, she appeared with Savorgnan at the Italian Consulate in Chicago, Illinois, and, in his presence, signed an instrument which contained an oath, in Italian, expressly renouncing her American citizenship and swearing her allegiance to the King of Italy.[3] No ceremony or formal administration of the oath accompanied her signature and apparently none was required. She and Sa-

---

[3] A translation shows that this instrument included the following statement:

"The person in question [Rosetta Andrus Sorge, who, as Rosette Sorge Savorgnan, later became the petitioner in the instant case],

vorgnan understood that her signing of this instrument had to do with her citizenship and with securing the required royal consent for Savorgnan to marry her, but he did not translate the instrument or explain its contents to her. The District Court found as a fact that, at the time of signing each of the documents mentioned, the petitioner, although intending to obtain Italian citizenship, had no intention of endangering her American citizenship or of renouncing her allegiance to the United States.

December 26, 1940, the petitioner and Savorgnan were married. In July, 1941, when Italian diplomatic officials were required to leave the United States, an Italian diplomatic passport was issued to the petitioner, and she embarked for Italy with her husband. She remained in Italy until November, 1945, except for six months spent in Germany. While in Italy she lived with her husband and his family in Rome, where he worked in the Italian Foreign Ministry. In November, 1945, she returned to America on an Italian diplomatic passport and later requested the Commissioner of the Immigration and Naturalization Service to correct the records of his office to show that she was an American citizen at the time of her return to America. The request was denied and she instituted the present proceeding.

There is no evidence of her maintaining, at any time after her marriage, a residence, dwelling place or place of general abode apart from her husband. The District

---

having been requested to take an oath . . . pronounced the following words:

" 'I, Rosetta Andrus Sorge, born an American citizen, declare I renounce and in truth do renounce my American citizenship, and swear to be faithful to H. M. the King of Italy and Albania, Emperor of Ethiopia, to his royal successors, and to loyally observe the statutes and other laws of the Kingdom of Italy.' " (Emphasis supplied.)

Court, however, found that, at the times of signing her application for Italian citizenship and the instrument containing her oath of allegiance to the King of Italy, she did not intend to establish a "permanent residence" in any country other than the United States. It found also that when she left America for Italy, "she did so without any intention of establishing a permanent residence abroad or abandoning her residence in the United States, or of divesting herself of her American citizenship." See 73 F. Supp. at 110.

We thus face two principal questions:

I. What was the effect upon the petitioner's American citizenship of her applying for and obtaining Italian citizenship? The Government contends that she thereby was naturalized in a foreign state in conformity with its laws within the meaning of either § 2 of the Act of 1907 or § 401 (a) of the Act of 1940.[4] It contends further that § 2 of the Act of 1907 did not require residence abroad as a condition of expatriation, and that she, therefore, was, then and there, effectively expatriated under that Act, merely upon becoming naturalized as an Italian citizen while still remaining in the United States. We agree that she was thus naturalized, but we do not find it necessary to pass upon the further contention that, by obtaining such naturalization in 1940, she then and there expatriated herself, and lost her American citizenship without taking up residence abroad.[5]

II. What was the effect upon the petitioner's American citizenship of her residence in Italy from 1941 to 1945? The Government contends that, even if the petitioner did not lose her American citizenship, in 1940, when she

---

[4] See notes 1 and 2, *supra*.

[5] The Government further claims that the petitioner's signing of the instrument containing her oath of allegiance to the King of Italy was an oath of allegiance to a foreign state within the meanings of § 2 of the Act of 1907, and of § 401 (b) of the Act of 1940. We agree.

became a naturalized Italian citizen, she lost it when she took up her residence in Italy. We agree. The Government contends that this expatriation was effected either under the Act of 1940 [6] or under the Act of 1907 as continued in effect by a saving clause in the Act of 1940. [7] We find it unnecessary to choose between these contentions because each leads to the same conclusion in this case.

## I.

*What was the effect upon the petitioner's American citizenship of her applying for and obtaining Italian citizenship?*

The requirements for expatriation under § 2 of the Citizenship Act of 1907 are objective. [8] That section provides that "any American citizen shall be deemed to have expatriated himself when he has been naturalized in any foreign state in conformity with its laws, or when he has taken an oath of allegiance to any foreign state." [9]

Traditionally the United States has supported the right of expatriation as a natural and inherent right of all people. [10] Denial, restriction, impairment or questioning

---

[6] See note 2, *supra.*

[7] Section 347 (a) of the Act of 1940 is set out in full in note 20, *infra.*

[8] The same is true of the requirements for expatriation under §§ 401 (a) and (b) and 403 (a) of the Nationality Act of 1940. See notes 1 and 2, *supra.* See also, *Bauer* v. *Clark,* 161 F. 2d 397 (C. A. 7th Cir.); *Reynolds* v. *Haskins,* 8 F. 2d 473 (C. A. 8th Cir.); *United States ex rel. De Cicco* v. *Longo,* 46 F. Supp. 170 (Conn.); *United States ex rel. Wrona* v. *Karnuth,* 14 F. Supp. 770 (W. D. N. Y.).

[9] For full text, see note 1, *supra.*

[10] *The Santissima Trinidad,* 7 Wheat. 283; *Murray* v. *The Charming Betsy,* 2 Cranch 64; *Case of Isaac Williams,* opinion of Ellsworth, C. J., see 2 Cranch 82–83, n.; *Talbot* v. *Janson,* 3 Dall. 133; *Ex parte Griffin,* 237 F. 445 (N. D. N. Y.); *Comitis* v. *Parkerson,* 56 F. 556 (C. C. E. D. La.); 14 Op. Atty. Gen. 295 (1872–1874); 8 Op. Atty. Gen. 139 (1856–1857).

of that right was declared by Congress, in 1868, to be inconsistent with the fundamental principles of this Government.[11]  From the beginning, one of the most obvious and effective forms of expatriation has been that of naturalization under the laws of another nation.  However, due to the common-law prohibition of expatriation without the consent of the sovereign, our courts hesitated to recognize expatriation of our citizens, even by foreign naturalization, without the express consent of our Government.[12]  Congress finally gave its consent upon the specific terms stated in the Citizenship Act of 1907 and in its successor, the Nationality Act of 1940.  Those Acts are to be read in the light of the declaration of policy

---

[11] "WHEREAS the right of expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness; and whereas in the recognition of this principle this government has freely received emigrants from all nations, and invested them with the rights of citizenship; and whereas it is claimed that such American citizens, with their descendents, are subjects of foreign states, owing allegiance to the governments thereof; and whereas it is necessary to the maintenance of public peace that this claim of foreign allegiance should be promptly and finally disavowed: Therefore,
*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That any declaration, instruction, opinion, order, or decision of any officers of this government which denies, restricts, impairs, or questions the right of expatriation, is hereby declared inconsistent with the fundamental principles of this government."  15 Stat. 223–224, R. S. § 1999, 8 U. S. C. § 800.
The above language, when enacted, was intended to apply especially to immigrants into the United States.  It sought to emphasize the natural and inherent right of such people to expatriate themselves from their native nationalities.  It sought also to secure for them full recognition of their newly acquired American citizenship.  The language is also broad enough to cover, and does cover, the corresponding natural and inherent right of American citizens to expatriate themselves.

[12] See note 10, *supra.*

favoring freedom of expatriation which stands unrepealed. 3 Hackworth, Digest of International Law §§ 242–250 (1942).

A. One contention of the petitioner is the novel one that her naturalization did not meet the requirements of § 2 of the Act of 1907,[13] because it did not take place within the boundaries of a foreign state. The answer is that the phrase in § 2 which states that "any American citizen shall be deemed to have expatriated himself when he has been naturalized *in* any foreign state in conformity with its laws, . . ." (emphasis supplied) refers merely to naturalization into the citizenship of any foreign state. It does not refer to the place where the naturalization proceeding occurs. The matter is even more clearly dealt with in the Act of 1940.[14] Section 401 (a) there lists "Obtaining naturalization in a foreign state, . . ." as a means of losing nationality. Section 403 (a) then states that expatriation shall result from the performance of the acts listed in § 401 "within the United States . . ." if and when the national performing them "thereafter takes up a residence abroad." Thus Congress expressly recognized that "naturalization in a foreign state" included naturalization proceedings which led to citizenship in a foreign state, but took place within the United States.

B. The petitioner's principal contention is that she did not intend to give up her American citizenship, although she applied for and accepted Italian citizenship, and that her intent should prevail. However, the acts upon which the statutes expressly condition the consent of our Government to the expatriation of its citizens are stated objectively.[15] There is no suggestion in the statutory language that the effect of the specified overt

---

[13] See note 1, *supra.*

[14] See note 2, *supra.*

[15] See note 8, *supra.*

acts, when voluntarily done, is conditioned upon the undisclosed intent of the person doing them.

The United States has long recognized the general undesirability of dual allegiances. Since 1795, Congress has required any alien seeking American citizenship to declare "that he doth absolutely and entirely renounce and abjure all allegiance and fidelity to every foreign prince, potentate, state or sovereignty whatever, and particularly by name, the prince, potentate, state or sovereignty, whereof he was before a citizen or subject; . . . ." 1 Stat. 414, see 8 U. S. C. § 735 (a).[16] Temporary or limited duality of citizenship has arisen inevitably from differences in the laws of the respective nations as to when naturalization and expatriation shall become effective. There is nothing, however, in the Act of 1907 that implies a congressional intent that, after an American citizen has performed an overt act which spells expatriation under the wording of the statute, he, nevertheless, can preserve for himself a duality of citizenship by showing his intent or understanding to have been contrary to the usual legal consequences of such an act.[17]

---

[16] The present statute requires an oath in the following form:

"I hereby declare, on oath, that I absolutely and entirely renounce and abjure all allegiance and fidelity to any foreign prince, potentate, state, or sovereignty of whom or which I have heretofore been a subject or citizen; that I will support and defend the Constitution and laws of the United States of America against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I take this obligation freely without any mental reservation or purpose of evasion: So help me God. In acknowledgment whereof I have hereunto affixed my signature." 54 Stat. 1157, 8 U. S. C. § 735 (b).

[17] See 3 Hackworth, Digest of International Law §§ 243, 244 (1942).

The Citizenship Board of 1906, appointed by the Secretary of State, proposed the expatriation provisions of the Act of 1907, and said in support of them:

"It is true that because of conflicting laws on the subject of citizenship in different countries a child may be born to a double allegiance;

This Court, in interpreting § 3 of the Act of 1907 as it existed from 1907 to 1922, has passed upon substantially this question. Section 3 then provided that "any American woman who marries a foreigner shall take the nationality of her husband." 34 Stat. 1228, repealed in 42 Stat. 1022. While that provision was in effect, a woman who was a native-born citizen of the United States married a subject of Great Britain residing in California. The woman had not intended to give up her American citizenship. On being advised that she had done so, she sought a writ of mandamus to compel the

but no man should be permitted deliberately to place himself in a position where his services may be claimed by more than one government and his allegiance be due to more than one." H. R. Doc. No. 326, 59th Cong., 2d Sess. 23 (1906–1907).

Similarly, the legislative history of the Nationality Act of 1940 contains no intimation that subjective intent is material to the issue of expatriation. On the other hand, it makes it clear that the relevant provisions of the new Act are a restatement of those in § 2 of the Act of 1907, and of the historic policy of the United States. Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, superseded by H. R. 9980, 76th Cong., 1st Sess. 489, 408 (1940).

In § 401 of the Act of 1940, Congress added a number of *per se* acts of expatriation. These included, among others, entering the armed forces of a foreign state, accepting office in a foreign state to which only nationals of such state were eligible, and voting in a political election of a foreign state. Lack of intent to abandon American citizenship certainly could not offset any of these. *A fortiori* a mature citizen who accepted naturalization into the full citizenship of a foreign state could not have been intended by Congress to have greater freedom to establish duality of citizenship.

Congress found it necessary after World War I to enact special legislation to assist men to regain their American citizenship after they had expatriated themselves by taking a foreign oath of allegiance required to permit them to enlist in the armies of certain foreign nations. 40 Stat. 340, 542 *et seq.* See 55 Cong. Rec. 6935, 7665–7666 (1917); S. Rep. No. 388, 65th Cong., 2d Sess. 7–8 (1917–1918); H. R. Rep. No. 532, 65th Cong., 2d Sess. 3–4 (1917–1918); 56 Cong. Rec. 6008–6009, 6011–6012 (1917–1918).

local Board of Elections to register her as a voter and she showed that she had the necessary qualifications for registration, provided she established her American citizenship. The Court held that, during her coverture, her expatriation was binding upon her as the statutory consequence of her marriage to a foreigner in spite of her contrary intent and understanding as to her American citizenship. She accordingly was denied relief. *Mackenzie* v. *Hare,* 239 U. S. 299. See also, *Ex parte Griffin,* 237 F. 445 (N. D. N. Y.). Cf. *Perkins* v. *Elg,* 307 U. S. 325.

The petitioner, in the instant case, was a competent adult. She voluntarily and knowingly sought and obtained Italian citizenship.[18] Her application for naturalization and her oath of allegiance were in Italian, which she did not understand, but Savorgnan did understand Italian, and he was with her and able to translate and explain them to her when she signed them. She knew that the instruments related to her citizenship and that her signature of them was an important condition upon which her marriage depended. She thus was as responsible for understanding them as if they had been in English. On that basis, she was married. Whatever the legal consequences of those acts may be, she is bound by them.

C. The Government contends vigorously that the petitioner's Italian naturalization, in 1940, then and there expatriated her. It contends that this provides sufficient basis, under the Act of 1907, to affirm the decision of the

---

[18] ". . . the forsaking of American citizenship, even in a difficult situation, as a matter of expediency, with attempted excuse of such conduct later when crass material considerations suggest that course, is not duress." *Doreau* v. *Marshall,* 170 F. 2d 721, 724 (C. A. 3d Cir.); but see, in cases of real duress, *Dos Reis* v. *Nicolls,* 161 F. 2d 860 (C. A. 1st Cir.); *Schioler* v. *United States,* 75 F. Supp. 353 (N. D. Ill.); *In re Gogal,* 75 F. Supp. 268 (W. D. Pa.).

Court of Appeals without reference to the petitioner's subsequent residence abroad. While recognizing the force of this alternative ground for affirmance, we do not rest our decision upon it. It is, however, entitled to be noted. The Government's argument is that, while residence abroad may have been required before the Act of 1907 and is now expressly required by the Act of 1940, it was not required under the Act of 1907. See *Mackenzie* v. *Hare,* 239 U. S. 299. The Government concedes, however, that, at least since 1933, the State Department has considered residence abroad to be a necessary element of expatriation. 3 Hackworth, Digest of International Law §§ 242–250 (1942). In our view, the petitioner's residence abroad from 1941 to 1945 makes it unnecessary to determine, in this case, what would have been her status if she had not taken up her residence abroad. We accordingly do not do so.

## II.

*What was the effect upon the petitioner's American citizenship of her residence in Italy from 1941 to 1945?*

A. The Nationality Act of 1940, including its repeal of § 2 of the Citizenship Act of 1907, took effect January 13, 1941.[19] The petitioner's residence abroad began after that date. It is contended that the effect of such residence may be determined either by the terms of the Act of 1940, or by those of the Act of 1907 continued in force by a saving clause in the Act of 1940.[20] We find, how-

---

[19] See §§ 504, 601 of the Act of 1940, 54 Stat. 1172, 1174, 8 U. S. C. §§ 904, 906.

[20] It is apparent that Congress did not intend to leave a gap in the statutory coverage of acts of expatriation.

"SEC. 347. (a) Nothing contained in . . . chapter V [including § 504 which expressly repealed § 2 of the Act of 1907] of this Act, unless otherwise provided therein, shall be construed to affect the validity of any declaration of intention, petition for naturalization,

ever, that the petitioner's residence and her naturalization have the same effect whether or not resort is had to the saving clause. Accordingly, it is not necessary to determine here whether the petitioner's residence and naturalization are to be tested under the saving clause or under the rest of the Act of 1940.[21]

B. The petitioner's residence abroad met the requirements of the Act of 1940. Sections 403 (a) and 104 used the terms "residence" and "place of general abode" without mention of the intent of the person concerned.[22] The Act cleared up the uncertainties which had been left by early decisions as to the type and amount, if any, of residence abroad that was required to establish expatriation.[23] In contrast to such terms as: "temporary residence," "domicile," "removal, with his family and effects," "absolute removal" or "permanent residence," the new

---

certificate of naturalization or of citizenship, or other document or proceeding which shall be valid at the time this Act shall take effect; or to affect any prosecution, suit, action, or proceedings, civil or criminal, brought, or any act, thing, or matter, civil or criminal, done or existing, at the time this Act shall take effect; but as to all such prosecutions, suits, actions, proceedings, acts, things, or matters, the statutes or parts of statutes repealed by this Act, are hereby continued in force and effect." 54 Stat. 1168, 8 U. S. C. § 747 (a).

Section 504 also included the following clause: "The repeal herein provided shall not terminate nationality heretofore lawfully acquired, nor restore nationality heretofore lost under any law of the United States or any treaty to which the United States may have been a party." 54 Stat. 1174, 8 U. S. C. § 904.

[21] Section 403 (a) of the Act of 1940 (see note 2, *supra*) may apply to antecedent naturalizations and oaths of allegiance, as well as to future ones. "A statute is not made retroactive merely because it draws upon antecedent facts for its operation." *Cox* v. *Hart*, 260 U. S. 427, 435. See also, *Reynolds* v. *United States*, 292 U. S. 443; *United States* v. *Bradley*, 83 F. 2d 483 (C. A. 7th Cir.); *United States ex rel. Rojak* v. *Marshall*, 34 F. 2d 219 (W. D. Pa.); 39 Op. Atty. Gen. 474 (1937–1940).

[22] See note 2, *supra*.

[23] See note 10, *supra*.

Act used the term "residence" as plainly as possible to denote an objective fact.[24] To identify the required "place of residence," it required only that it be the "place of general abode." Confirmation of this intended simplification appears in the Report on Revision and Codification of the Nationality Laws of the United States, submitted by the Secretary of State, Attorney General and Secretary of Labor to Congress on the bill which became the Nationality Act of 1940:

> "Definitions of 'residence' frequently include the element of intent as to the future place of abode. However, in section 104 hereof no mention is made of intent, and the actual 'place of general abode' is the sole test for determining residence. The words 'place of general abode,' which are taken from the second paragraph of section 2 of the Citizenship Act of March 2, 1907 (34 Stat. 1228), seem to speak for themselves. They relate to the principal dwelling place of a person." [25]

The District Court did not find that the petitioner failed to take up an actual residence or place of general abode abroad. It found merely that in "July 1941 *when she left this country for Italy* she did so without any intention of establishing *a permanent residence abroad or abandoning her residence in the United States, . . . .*" (Emphasis supplied.) See 73 F. Supp. at 110. Under the Act of 1940, the issue is not what her intent was on leaving the United States, nor whether, at any later time, it was her intent to have a permanent residence abroad or to have a residence in the United States. The issue

---

[24] Where "permanent residence" was intended, the statute used that term. *E. g.*, §§ 308 and 407 of the Act of 1940, 54 Stat. 1143, 1170, 8 U. S. C. §§ 708, 807.

[25] Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, superseded by H. R. 9980, 76th Cong., 1st Sess. 417 (1940).

is only whether she did, at any time between July, 1941, and November, 1945, in fact "reside" abroad. The test of such "residence" is whether, at any time during that period, she did, in fact, have a "principal dwelling place" or "place of general abode" abroad. She testified that, from 1941 to 1945, she lived with her husband and his family in Rome, except for six months' internment in Salzburg, Germany. Whatever may have been her reasons, wishes or intent, her principal dwelling place was in fact with her husband in Rome where he was serving in his Foreign Ministry. Her intent as to her "domicile" or as to her "permanent residence," as distinguished from her actual "residence," "principal dwelling place," and "place of abode," is not material. She expatriated herself under the laws of the United States by her naturalization as an Italian citizen followed by her residence abroad.[26]

The judgment of the Court of Appeals, accordingly, is affirmed, and the case is remanded to the District Court with directions to dismiss the petition against the United States and to enter judgment in favor of the other defendants in conformity with this opinion.

*Affirmed.*

Mr. Justice Douglas took no part in the consideration or decision of this case.

Mr. Justice Frankfurter, whom Mr. Justice Black joins, is of opinion that the judgment of the District

---

[26] If the test is to be made under the saving clause quoted in note 20, *supra*, that may mean that the need and character of her residence are to be determined under the Act of 1907. Under the contention of the Department of Justice no residence abroad would be required. Under the practice of the Department of State some residence abroad would be required. 3 Hackworth, Digest of International Law §§ 242–250 (1942). But we believe that the provisions of §§ 403 (a) and 104 of the Act of 1940 substantially reflect the requirements of that residence.

Court should be reinstated. Law of course determines the legal consequences of conduct. But both the Citizenship Act of 1907 and the Nationality Act of 1940 raise issues of fact, and the District Court allowably found the facts in favor of the petitioner. Since expatriation does not follow on the basis of such finding, the judgment of the District Court should not have been disturbed. 73 F. Supp. 109.