**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William L. MATHESON, Executor of the Will of Dorothy Gould Burns, Deceased, Defendant-Appellant.**

**William L. MATHESON, Executor of the Will of Dorothy Gould Burns, Deceased, Plaintiff-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

**No. 595, Docket 75–6062.**

United States Court of Appeals, Second Circuit.

Argued Jan. 16, 1976.

Decided March 3, 1976.

John S. Martin, Jr., New York City (Herbert H. Chaice, Martin, Obermaier & Morvillo, Patterson, Belknap & Webb, New York City, of counsel), for appellant Matheson.

Mel P. Barkan, Asst. U. S. Atty. (Thomas J. Cahill, U. S. Atty., William S. Brandt, Asst. U. S. Atty., of counsel), for appellee United States.

Before LUMBARD, SMITH and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge.

Since United States citizenship is considered by most to be a prized status, it is usually the government which claims that the citizen has lost it, over the vigorous opposition of the person facing the loss. In this rare case the roles are reversed. Here the estate of a wealthy deceased United States citizen seeks to establish over the government's opposition that she expatriated herself. As might be suspected, the reason is several million dollars in tax liability, which the estate might escape if it could sustain the burden of showing that the deceased lost her United States citizenship. Although this appeal involves claims of gift and income tax liabilities amounting to only about $24,000, there waits in the wings of the Tax Court a pending estate tax dispute involving approximately $3.25 million, which turns on our resolution of the legal issues raised here. The size of the sum at stake has understandably produced zealous and ingenious legal arguments on the taxpayer's part. However, finding them without merit, we affirm the grant by the district court, Kevin T. Duffy, *Judge*, of summary judgment in favor of the government.

The facts essential to our decision are not in dispute. Dorothy Gould Burns, the granddaughter of the railroad magnate Jay Gould, was born in the United States in 1904. It is undisputed that she remained a United States citizen for the first 40 years of her life. Her pre-1944 history, insofar as it is pertinent, reveals that in 1919 she left the United States for Europe, never to reestablish residence in this country. In 1925 she married a Swiss Baron, Roland Graffenreid de Villars, their marriage producing two daughters but ending in divorce in 1936. Through this period Mrs. Burns traveled as a citizen of the United States, relying upon a United States passport until 1934. Thereafter, due to the concededly erroneous refusal of the Passport Office to grant a new passport, she traveled upon an "affidavit in lieu of passport" issued by the American Consulate. When the Germans occupied France, she returned to the United States in 1941 on a newly issued American passport but remained only briefly, soon departing for Cuba where she met her second husband, Archibald Burns, a Mexican national of Scottish parents. She followed Mr. Burns to Mexico where they married in 1944.

Now enters the crucial event of this story. Since an alien woman who married a Mexican man was a citizen by naturalization under Mexican law, the Burns' contacted a Mexican attorney, Francisco Liguori, and applied to the Mexican Ministry of Foreign Relations for a certificate of her Mexican nationality. The pertinent paragraph of her petition for the certificate, which her executor now claims to have represented a renunciation of her nationality of origin, i. e., an act of expatriation terminating her United States citizenship, reads as follows:

"I herewith formally declare my allegiance, obedience, and submission to the laws and authorities of the Republic of Mexico; I expressly renounce all protection foreign to said laws and authorities and any right which treaties or international law grant to foreigners, expressly furthermore agreeing not to invoke with respect to the Government of the Republic any right inherent in my nationality of origin."

The government today argues, and this interpretation was adopted by the State

Department in 1945 and again in 1953 when Mrs. Burns' request for a United States passport was held in abeyance pending resolution of the matter, that Mrs. Burns merely sought the certificate as evidence of her Mexican citizenship for two reasons entirely compatible with her simultaneous retention ·of United States nationality. First, it enabled her to obtain a Mexican passport, which simplified her problems with travel restrictions in that country and permitted her to establish permanent residence therein. Second, it enabled her to gain expedited entry into Mexico of her oldest daughter by her first marriage as a preferred immigrant.

It is also undisputed that throughout the remainder of her life, both Mrs. Burns and William Matheson, her lawyer at that time and her executor in this action, represented to others and acted as if the 1944 declaration did not constitute an act of expatriation. The most telling instances occurred in the course of her dealings with the United States Passport Office. On May 2, 1947, Mrs. Burns decided to resume her travels in Europe and accordingly applied to the State Department of the United States for a renewal of her American passport, claiming United States citizenship and stating under oath in her "Affidavit by Native American to Explain Protracted Foreign Residence" that she had "never taken an oath or made an affirmation or other formal declaration of allegiance to a foreign state." She signed similar sworn statements in 14 other affidavits and passport applications until a year before her death in 1969. In fact, in 1952–1953, when the State Department delayed issuance of a passport to Mrs. Burns pending a determination of whether her Mexican marriage and acquisition of a Mexican naturalization certificate constituted expatriating conduct, Matheson represented Mrs. Burns in the discussions with the State Department, which resolved the matter by concluding that Mrs. Burns enjoyed dual citizenship and therefore qualified for a United States passport. In a letter to Mrs. Burns on the following day, March 24, 1953, Matheson advised that the validity of her United States citizenship was not firmly settled, although both parties plainly viewed her loyalty largely as a matter of practical expediency:

"Now, first the decision that you are a United States citizen is favorable and we do not wish you to do anything to disturb it. This is true not so much from a United States tax standpoint as from the standpoint of the rights and privileges you will enjoy at the time of your father's death. It may help you to avoid any Mexican inheritance taxes then also. It may be that after his estate is settled we shall recommend that you renounce your United States citizenship if you are to continue living abroad in order to avoid any gift tax in creating a trust, but this is in the distant future. . . . Let me emphasize again, do not do anything in choosing that will put your United States citizenship in jeopardy."

The government offers a wealth of similar documentary evidence demonstrating that Mrs. Burns and Matheson continually believed and represented that she was a citizen of the United States. For example, during the post-1944 period, Matheson prepared for Mrs. Burns 21 separate federal tax returns in which they both stated under penalty of perjury that she was a United States citizen. In 1968 and 1969 Mrs. Burns and Matheson, respectively, informed the French taxing authorities that she was an American citizen, thereby excluding her United States income, largely in the form of municipal securities, tax exempt in this country, from French taxation as well. In three separate tax returns submitted to the French authorities in 1959, 1966, and 1969, Mrs. Burns announced her nationality as "Americain." Similarly in 1958 as a United States citizen she applied to the Coast Guard for American registration for her private yacht, thereby permitting its duty-free entry into France. And in 1969, Matheson reported her death to the appropriate American officials in France in a form entitled "Report of the Death of an American Citizen."

Despite this mass of evidence, appellant takes the position that as a matter of law

Mrs. Burns expatriated herself in 1944 when she submitted her petition requesting a Mexican certificate of nationality. The executor raised this argument in two actions that have been consolidated for consideration by the district court and now by this court. In May 1973 the United States commenced an action in the Southern District of New York (73 Civ. 2011) against the executor to recover $6,948.97 of income taxes and interest for the year 1966 on the ground that the government improperly had refunded this sum to Mrs. Burns' estate in reliance on her executor's claim that she was not a United States citizen in 1966. While this action was pending the executor initiated his own suit challenging the previous payment of $9,954.17 in gift taxes and interest for the years 1966–68 on the identical ground that Mrs. Burns was not a citizen during that period. In the consolidated action Judge Duffy on May 27, 1975, granted summary judgment in favor of the United States, holding (1) that Dorothy Gould Burns was a citizen of the United States throughout her lifetime and (2) that in any event her estate is estopped from today claiming that she expatriated herself in 1944. From these orders the executor appeals.

## DISCUSSION

*Mrs. Burns' Citizenship*

■ In deciding whether the district court acted properly in granting summary judgment in favor of the government, we are, of course, bound by a long-standing principle recently reaffirmed by us, see *Judge v. Buffalo,* 524 F.2d 1321 (2d Cir. 1975); *Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317 (2d Cir. 1975); *Rhoads v. McFerran,* 517 F.2d 66, 67–68 (2d Cir. 1975), that the court's function upon a motion for summary judgment is not to resolve issues of fact but to determine whether any material factual issues are raised after resolving all questionable inferences in favor of the party against whom

the judgment is sought. Only if no material factual issues exist may summary judgment be granted. However, it is equally true that summary judgment should not be denied where the only issues raised are frivolous or immaterial ones which would simply serve to provide an exercise in futility or a purposeless trial for the district court, particularly where no jury has been demanded. See *Beal v. Lindsey,* 468 F.2d 287, 292 (2d Cir. 1972); *Houghton Mifflin Co. v. Stackpole Sons, Inc.,* 113 F.2d 627, 628 (2d Cir.), *cert. denied,* 308 U.S. 597, 60 S.Ct. 131, 84 L.Ed. 499 (1940). To ascertain whether any material issues are raised we must first briefly review the principles governing expatriation of American citizens in Mrs. Burns' position and consider the undisputed evidence in the light of those principles.

Title 8 U.S.C. § 1481(a)(1) & (2), which governs the expatriation of American citizens,[1] provides in pertinent part:

"(a) From and after the effective date of this chapter a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—

(1) obtaining naturalization in a foreign state upon his own application . . . ; or

(2) taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof . . . ."

Relying upon *Savorgnan v. United States,* 338 U.S. 491, 499–500, 70 S.Ct. 292, 94 L.Ed. 287 (1950), appellant argues that these sections of the Act provide clearcut objective guidelines specifying conduct by a citizen that will automatically result in his or her expatriation and that since Mrs. Burns' 1944 declaration fell within the terms of the statute she lost her American citizenship upon executing it.

■ This argument, however, is undermined by the Supreme Court's later decision in *Afroyim v. Rusk,* 387 U.S. 253, 87

1. This statutory provision virtually is identical to the Nationality Act of 1940, §§ 401(a) & (b), the statute in force in 1944 when Mrs. Burns petitioned for her Mexican certificate of nationality.

S.Ct. 1660, 18 L.Ed.2d 757 (1967), where the Court held unconstitutional another section of the Nationality Act which provided in similar unqualified terms that a United States citizen would lose his citizenship by voting in a foreign political election. Noting that the Fourteenth Amendment insures that "[a]ll persons born or naturalized in the United States . . . are citizens," the Court concluded that an act of Congress cannot strip an individual of his citizenship in the absence of a "voluntary relinquish[ment]" on his part. *Id.* at 268, 87 S.Ct. at 1668, 18 L.Ed.2d at 767. The Court explicitly rejected earlier cases applying an objective test of the type favored by appellant here, under which a person would lose his American citizenship "regardless of [his] intention not to give it up." *Id.* at 255, 87 S.Ct. at 1661, 18 L.Ed.2d at 759. *Afroyim's* requirement of a subjective intent reflects the growing trend in our constitutional jurisprudence toward the principle that conduct will be construed as a waiver or forfeiture of a constitutional right only if it is knowingly and intelligently intended as such. Surely the Fourteenth Amendment right of citizenship cannot be characterized as a trivial matter justifying departure from this rule. Accordingly, there must be proof of a specific intent to relinquish United States citizenship before an act of foreign naturalization or oath of loyalty to another sovereign can result in the expatriation of an American citizen. See, e. g., *King v. Rogers,* 463 F.2d 1188, 1189–90 (9th Cir. 1972); *Jolley v. INS,* 441 F.2d 1245, 1249 (5th Cir.), *cert. denied,* 404 U.S. 946, 92 S.Ct. 302, 30 L.Ed.2d 262 (1971).

Appellant offers several grounds for distinguishing *Afroyim* and the "subjective-standard" cases which have followed in its wake. However, none of these distinctions is persuasive. First, he argues that *Rogers v. Bellei,* 401 U.S. 815, 91 S.Ct. 1060, 28 L.Ed.2d 499 (1971), constitutes a *sub silentio* overruling of *Afroyim.* We disagree. In *Rogers* the Court upheld the constitutionality of § 301(b) of the Immigration and Nationality Act of 1952, which provides that one who acquires American citizenship overseas through birth abroad to an Ameri-

can parent shall lose this citizenship unless he resides in this country for a minimum five-year interval between the ages of 14 and 28. As Justice Blackmun took pains to point out, *Afroyim* was not thereby repudiated, since it dealt with citizenship that is constitutionally protected under the Fourteenth Amendment, i. e., citizenship derived by virtue of birth in the United States or by naturalization in the United States, see, e. g., *id.* at 822, 823, 827, 828, and 835, 91 S.Ct. at 1064, 1065, 1067, 1071, 28 L.Ed.2d 504, 505, 507, 511, whereas the citizenship at issue in *Rogers* owed its existence solely to an act of Congress. What Congress granted it had the power to take away or to modify by subjecting its "generosity" to appropriate conditions precedent or subsequent, *id.* at 835, 91 S.Ct. at 1071, 28 L.Ed.2d at 511, even though it would be powerless to strip a person of constitutionally-protected citizenship on the same grounds in the absence of a voluntary relinquishment on the citizen's part. Since Mrs. Burns was a United States citizen by birth, she could not lose her citizenship in the absence of proof that she intentionally relinquished it.

■ Appellant next argues that *Afroyim* should be limited to loss of citizenship by reason of voting in foreign elections and therefore should not apply to this case, which involves wholly different sections of the Nationality Act. However, we see no reason to accept such a narrow, indeed stilted, interpretation of *Afroyim.* In that case the Court reasoned that since the mere act of voting elsewhere does not necessarily demonstrate a relinquishment of allegiance or an expression of disloyalty to the United States, one must look beyond the citizen's bare conduct to determine whether he intended by so voting to forego his claim of citizenship. The same reasoning applies with equal force to a declaration of allegiance to a foreign sovereign or a petition for a certificate of Mexican nationality of the type executed by Mrs. Burns, which may simply represent the citizen's claim of dual nationality rather than a turning of his back on the United States or a voluntary

relinquishment of his American citizenship. See generally, *Nishikawa v. Dulles,* 356 U.S. 129, 135, 78 S.Ct. 612, 616, 2 L.Ed.2d 659, 664 (1958); *Kawakita v. United States,* 343 U.S. 717, 723–24, 72 S.Ct. 950, 955–56, 96 L.Ed. 1249, 1257 (1952); *Jalbuena v. Dulles,* 254 F.2d 379, 381 (3d Cir. 1958); *Peters v. Secretary of State,* 347 F.Supp. 1035, 1038 (D.D.C.1972) (3-judge court). Furthermore, since the purely objective legal meaning of such a declaration is likely to turn upon highly technical interpretations of foreign, domestic, and international law concerning the status of dual nationals,[2] it would be unfair to strip an individual of his American birthright when he honestly but mistakenly believed that his conduct did not compromise his legal status as a United States citizen or as a dual national. Accordingly, to prevent such unfairness and to avoid questionable interpretations of the meaning and effect of a declaration or foreign naturalization petition, a citizen's specific intent to relinquish his citizenship must be proven before a statement of loyalty to a foreign sovereign is binding as an act of expatriation. This requirement of proof recognizes the overwhelming importance of American citizenship. As the Supreme Court only recently has reminded us, the status of citizen, despite the expanding protection afforded aliens under the Equal Protection Clause, remains central to the very definition of a social and political community. *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853, 862 (1973). An individual denied his or her United States citizenship, even if permitted entry into the country, is denied effective participation in our country's electoral processes, *id.* at 647–49, 93 S.Ct. at 2850–51, 37 L.Ed.2d at 862–64, which is ordinarily regarded as a fundamental constitutional interest, as well as access to a range of livelihoods and positions opened only to citizens of this country, *id.* at 647, 93 S.Ct. at 2850, 37 L.Ed.2d at 862. Indeed, the record reveals (see *supra,* p. 813) that in this case Mrs. Burns used her American citizenship to gain benefits which would not have been available to her as a Mexican national.

For these reasons we conclude that appellant could prevail only by establishing that Mrs. Burns, in executing her 1944 declaration, intended to expatriate herself rather than merely to assume the status of a dual national. Turning to the question of whether an issue of fact has been raised regarding her intent, we note that, in view of her unavailability to testify, the evidence on the subject, which was carefully analyzed by the district court, is almost entirely documentary in character, thus presenting a more appropriate case for summary judgment than would a proceeding involving live witnesses and unresolved issues of credibility.

The starting point for an evaluation of Mrs. Burns' intent lies in her December 21, 1944, declaration which was prepared by the Burns' Mexican counsel, signed by her and submitted to the Ministry of Foreign Relations of Mexico after the Burns' had requested their counsel to obtain a certificate of Mexican nationality for Mrs. Burns, based on her recent marriage and establishment of a domicile in Mexico. Without such a certificate Mrs. Burns would have had no tangible evidence that she had acquired Mexican citizenship through marriage to Burns. As evidence of her Mexican nationality such a certificate would aid her in securing preferred immigration status for her daughter Rolande and facilitate permanent residence by Mrs. Burns in Mexico and her travel in and out of that country. Without a Mexican passport, obtainable through such proof of her status as a

---

2. The United States has periodically investigated the question of whether women in the position of Mrs. Burns should be considered expatriated Americans or holders of both United States and Mexican citizenship. In 1945 and again in 1953, the United States State Department concluded that such persons had dual citizenship status. Appellant seeks to overturn this view by reference to diverse Mexican constitutional provisions, legislative enactments, and an executive memorandum as well as by an analysis of the relationship between Mexico and other nations (not including the United States) that had joined together in a 1936 international pact. One could hardly hold Mrs. Burns responsible had she in 1944 failed to grasp the "objective" legal consequences of her petition for a certificate of nationality.

Mexican national, Mrs. Burns might have had difficulty entering, leaving, and remaining for long periods in Mexico.

■ Appellant characterizes Mrs. Burns' 1944 declaration—incorrectly in our view—as a "renunciation of nationality of origin," i. e., of United States citizenship. The passage upon which appellant relies reads:

"I expressly renounce all protection foreign to said laws and authorities [of Mexico] and any right which treaties or international law grant to foreigners, expressly furthermore agreeing not to invoke with respect to the Government of the Republic [of Mexico] any right inherent in my nationality of origin."

Although the declaration, when scanned superficially, may appear to support appellant's interpretation, a closer look reveals it to be merely a subscription to a basic principle of international law governing dual nationality: that a national of one country (e. g., United States) may not look to it for protection while she is in another country (e. g., Mexico), of which she is also a national. This principle has repeatedly been recognized by the Supreme Court of the United States. *Nishikawa v. United States, supra,* 356 U.S. at 132, 78 S.Ct. at 614, 2 L.Ed.2d at 662; *Kawakita v. United States, supra,* 343 U.S. at 733, 72 S.Ct. at 960, 96 L.Ed. at 1262. Had Mrs. Burns wished to expatriate herself she could simply have unequivocally stated that she renounced her American citizenship. Compare, e. g., *Savorgnan v. United States, supra,* 338 U.S. at 495, n. 3, 70 S.Ct. at 294, 94 L.Ed. at 292 ("I, Rosetta Andrus Sorge, born an American citizen, declare I renounce and in truth do renounce my American citizenship . . . ."); *Jolley v. INS, supra,* 441 F.2d at 1247 (petitioner formally executed an Oath of Renunciation and announced "I renounced my United States citizenship, thus terminating all obligations to the United States."). Instead, she used language to

the effect that as a Mexican national she could not claim her rights as a United States citizen "with respect to the Government of the Republic [of Mexico]. . . ." This limited surrender did not preclude her from claiming rights as a United States citizen *outside of* Mexico. See *Nishikawa v. United States, supra.* Indeed, once outside of Mexico she did not hesitate, consistent with this interpretation of her 1944 declaration, to invoke important rights and privileges inherent in her United States birthright. Thus we must conclude that the 1944 declaration amounted to nothing more than a statement of dual nationality.

Our reading of Mrs. Burns' 1944 declaration is in accord both with Mexican laws then in effect governing the nationality of non-Mexican women who married Mexican nationals and with the terms of the certificate of Mexican nationality issued to Mrs. Burns. Article 30(b)(II) of the Mexican Political Constitution as it existed in 1944 defines a "Mexican by naturalization" to include "[t]he foreign woman who contracts matrimony with a Mexican and has or establishes her domicile within the national territory." The Mexican Nationality and Naturalization Act of 1934, which was in force in 1944, similarly provided that an alien woman marrying a Mexican and establishing her domicile in Mexico thereby became a Mexican national, with the Ministry of Foreign Relations being directed in such a case to issue the necessary certificate.[3] In accordance with these provisions the certificate of Mexican nationality issued to Mrs. Burns on January 2, 1945, did not provide that she "thereby" became a Mexican citizen; it merely confirmed that she had acquired Mexican nationality "as of the date of her marriage." On the strength of these provisions of Mexican law and the failure of Mexican officials to provide an interpretation to the contrary, the United States Acting Secretary of State in August 1945 instructed our Ambassador to Mexico

---

**3.** Article 2 of the Act read in pertinent part: "The following are Mexicans by naturalization:

\* \* \* \* \* \*

"II. Any alien woman who marries a Mexican and who has or establishes her domicile within the national territory. . . .

"The Ministry of Foreign Relations will issue the corresponding declaration in this case."

that women such as Mrs. Burns are considered nationals of both the United States and Mexico.

The foregoing interpretation of the pertinent provisions of Mexican law was contemporaneously shared by knowledgeable officials in Mexico. In 1949 the Mexican naturalization law was substantially modified explicitly to require a renunciation of other citizenship in applying for a certificate of Mexican nationality. In reporting to the Mexican Congress as to how this 1949 amendment altered the law in force until that date, Oscar Trevino Rios, the Chief of the Legal Section of the Mexican Foreign Office, explained that previously foreign women who married Mexicans were treated as dual nationals while under the new law they must renounce foreign allegiance.

Thus, prior to the 1949 amendments of the Mexican Law of Nationality and Naturalization, which precluded a non-Mexican citizen from acquiring dual nationality, the generally accepted view was that a foreign woman who married a Mexican citizen thereby automatically acquired Mexican citizenship but did not lose her citizenship of origin, thus gaining dual nationality. That this was Mrs. Burns' understanding of her status as well as that of her lawyer and executor, William Matheson, during the remainder of her life, is attested to by an unwavering line of representations, statements, and actions by both in which they made it clear that Mrs. Burns did not intend her 1944 declaration to represent a forfeiture of her United States citizenship. Moreover, in personal communications between Matheson and Mrs. Burns, at a time when neither party would have had an incentive to misrepresent her national status, both assumed that Mrs. Burns had never renounced or in any way forfeited her Unit-

ed States citizenship. For example, when the State Department in 1952–53 delayed issuance of Mrs. Burns' passport pending determination of the legal significance of her 1944 Mexican declaration and marriage, Matheson wrote her letters on December 11, 1952, February 17, 1953, and March 24, 1953, assuring her that she remained a citizen of the United States and would prevail before the Passport Office.

Faced with these prevailing official contemporaneous interpretations of pertinent Mexican law and with overwhelming evidence that Mrs. Burns did not intend to relinquish her United States citizenship, appellant seeks to avoid summary judgment on two grounds. First he contends, on the basis of an opinion provided at his request in 1974 by the Legal Department of the Mexican Foreign Ministry, that a 1936 international conference (which included Mexico but not the United States) pledged the signatory countries to reduce instances of dual nationality whenever possible and consequently Mexico purportedly required a renunciation of other national ties as precondition to Mexican naturalization. Whatever is the merit of this recently-adopted view of Mexican law,[4] it raises no material issue with respect to this case which under *Afroyim* is not concerned with current retrospective views of Mexican law but with *Mrs. Burns' understanding* of Mexican law in 1944 insofar as it might bear upon her intention voluntarily to relinquish her United States citizenship or to remain loyal to two countries. Viewed in this light, the evidence simply is overwhelming that Mrs. Burns did not interpret Mexican law as does her executor today, never formed the requisite intent to expatriate, and consistently viewed herself as a dual national of both the United States and Mexico. Noth-

4. The 1974 opinion of the Foreign Ministry is at best ambiguous, representing the third opinion furnished by the Ministry at the request of the Burns family after two earlier ones appear to apply the wrong Mexican law. The opinion appears in conflict with the Mexican constitutional and statutory language in force in the 1940s, with the language of the certificate of nationality that was issued to

Mrs. Burns, with the interpretation offered by the head of the Legal Department of the Foreign Ministry in the late 1940s when the naturalization law was modified to expressly require a renunciation by women like Mrs. Burns, and with the understanding of the United States State Department reached in 1944–45 after communication with Mexican officials.

ing in the Mexican Government's 1944 conduct or pronouncements could have indicated to her in any way that her receipt of a Mexican certificate of nationality must be coupled with a renunciation of United States citizenship. On the contrary, the terms of the certificate issued to her by Mexico in January, 1945, by confirming that she acquired her Mexican citizenship "as of the date of her marriage," indicated that there was no need for her to renounce her loyalty to the United States. As seen earlier this interpretation was not only consistent with prevailing Mexican law then in force but also with the view of the United States then and now.

Although the Mexican Foreign Office in 1974 has advised through appellant that these earlier interpretations are incorrect and that the 1949 amendments merely were designed to codify rather than change pre-existing law, there is no evidentiary basis for imputing to Mrs. Burns' knowledge of this belated Mexican interpretation, which comes some 30 years after the fact. In light of the plain wording of the document she signed, the certificate she sought and obtained, and the contemporaneous pronouncements of both our government and Mexico, she could not have known in 1944 (or for the balance of her life) that her declaration of allegiance to Mexico would be taken to represent a voluntary act of expatriation toward the United States. No material issue, therefore, is raised by the Mexican Foreign Office's 1974 opinion.

 As a second basis for raising a material factual issue as to Mrs. Burns' intent to expatriate herself, appellant proposes to offer the testimony of her Mexican lawyer, Francisco Liguori, regarding his ex-

planation to her of the language of her 1944 declaration at the time that she signed it. However, we have already had the benefit of his deposition testimony on the same subject matter in which, despite leading questions by appellant's counsel, he offered no evidence from which an inference of knowing and voluntary relinquishment of American citizenship might be drawn. His pertinent testimony amounted to nothing more than proof that he acquainted her with the substance of the declaration itself which, as we have seen, is not expatriating in nature. While normally we would deny summary judgment in the face of an offer of live testimony which, if found credible by the trier of the fact, might support a material inference adverse to the movant, here there is no indication that Liguori's live testimony would add anything substantial to his deposition, which fails completely to bolster the estate's claim that Mrs. Burns intended in 1944 to renounce her United States citizenship. In this connection it must furthermore be remembered that the burden of proving her expatriation, which appellant has assumed, is a heavy one. The party arguing for loss of citizenship must support his argument by "clear, convincing and unequivocal evidence." *Nishiwaka v. Dulles, supra,* 356 U.S. at 133, 78 S.Ct. at 615, 2 L.Ed.2d at 663. Ambiguities in the evidence are to be resolved in favor of citizenship, *id.* at 136, 78 S.Ct. at 617, 2 L.Ed.2d at 665. *Perkins v. Elg,* 307 U.S. 325, 337, 59 S.Ct. 884, 891, 83 L.Ed. 1320, 1327 (1939), and courts must strain to construe both facts and applicable law "as far as is reasonably possible in favor of the citizen." *Schneiderman v. United States,* 320 U.S. 118, 122, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796, 1800 (1943).[5] Thus Liguori's

5. Title 8 U.S.C. § 1481(c) provides that the party seeking a citizen's expatriation must "establish such claim by a preponderance of the evidence." But *Afroyim's* requirement of a specific intent adds a constitutional element to loss of citizenship that is not found in the statute and the strong preference exhibited by *Afroyim* and earlier cases for retention of citizenship establishes, as the Attorney General of the United States recognizes, "that this burden is not easily satisfied. . . . ," 42 Op.Atty.

Gen., No. 34 at 4 (1964). In fact, a heavy burden of proving intent to expatriate is particularly appropriate in cases where the citizen apparently believed that he was a dual national since a person is unlikely to have voluntarily relinquished his United States citizenship if he believed himself eligible to remain loyal to two countries and thereby receive the benefits of both nationalities. See, e. g., *Peter v. Secretary of State,* 347 F.Supp. 1035, 1038–39 (D.D.C. 1972) (3-judge court).

testimony, even accepted as fully credible, could not hope to satisfy this heavy burden, in light of the remaining undisputed evidence in this case that not only fails to show that Mrs. Burns intended expatriation but, on the contrary, overwhelmingly supports the inference that she sought and obtained dual nationality.

### Estoppel

■ In any event, the record is clear that her estate would now be estopped from asserting her loss of citizenship today. For a period of more than 20 years after her 1944 declaration, Mrs. Burns and her attorney, William Matheson, who here acts as her executor, repeatedly represented to the United States Government under oath that she continued to be a citizen of the United States and that she had never taken an oath of affirmation or allegiance to a foreign state. These representations led to an investigation in 1953 by the United States State Department, which concluded, in a decision characterized by appellant as an "adjudication," that Mrs. Burns had retained her United States citizenship. In reliance upon these representations of United States citizenship the United States made available to Mrs. Burns a host of benefits, including (1) the issuance to her of United States passports on 15 different occasions, (2) the issuance by the United States Coast Guard of a license for her yacht, entitling it to fly the American flag and gain duty-free entrance into France, and (3) registry of her as an American citizen with the United States Mission in France, entitling her to assistance by United States officials overseas. As an American citizen she furthermore was excused from payment of taxes to the government of France, which would otherwise have been levied on her income.

■ The United States, having furnished these benefits to Mrs. Burns in reliance upon her numerous representations of loyalty to it, is entitled to her estate's observation of her corresponding obligations, including the payment of taxes. Cf.

*Cook v. Tait,* 265 U.S. 47, 56, 44 S.Ct. 444, 445, 68 L.Ed. 895, 898 (1924); *United States v. Bennett,* 232 U.S. 299, 307, 34 S.Ct. 433, 437, 58 L.Ed. 612, 616 (1914). Courts now routinely hold that one gaining governmental benefits on the basis of a representation or asserted position is thereafter estopped from taking a contrary position in an effort to escape taxes. Two cases are particularly relevant to the facts here. In *Rexach v. United States,* 390 F.2d 631, 632 (1st Cir.), *cert. denied,* 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968), the taxpayer earlier had renounced his American citizenship but thereafter succeeded in acquiring a United States passport by representing to the State Department that the renunciation had been involuntarily given. In a subsequent action by the government for taxes owed the court found and the taxpayer conceded that "as a matter of law he is precluded by the record [for] claiming that he ever ceased to be a United States citizen . . . ." Similarly in *Kurz v. United States,* 156 F.Supp. 99, 106 (S.D.N.Y.1957), *aff'd on opinion below,* 254 F.2d 811 (2d Cir. 1958), where the decedent had throughout his lifetime "performed acts of control" over a trust and "obtained the advantages of his reservation of power . . . ." the court held that his executors were estopped to challenge the inclusion of the principal of the trust in his taxable gross estate, concluding that "his representatives should not now be permitted to take an inconsistent stand to the detriment of the Government, which has appropriately imposed the tax in reliance upon the decedent's act." See also *Commissioner v. National Lead Co.,* 230 F.2d 161 (2d Cir. 1956), *aff'd without reaching issue,* 352 U.S. 313, 77 S.Ct. 347, 1 L.Ed.2d 352 (1957) (taxpayer who received a tax benefit from the War Production Board thereby forfeits his right to later challenge the authority of the same Board with respect to a different transaction).

Appellant contends that such a finding of collateral or equitable estoppel is not warranted where the party against whom it is asserted acted under an innocent misapprehension of the law. Regardless of the va-

lidity of this premise, however, it has no application to the undisputed facts of this case. Mrs. Burns and her lawyer repeatedly swore not only that she was a citizen of the United States but that she had never made an oath or declaration of allegiance to a foreign sovereign. Thus they represented *both* that she had neither formed the subjective intent to expatriate nor performed the objective acts proscribed by the Nationality Act. Regardless of Mrs. Burns' understanding of American naturalization law, these statements would preclude her estate from today asserting that she had misrepresented her conduct. The deliberate and devious nature of appellant's representations is further underscored by his March, 1953, letter to Mrs. Burns stating that she should not do anything "that will put your United States citizenship in jeopardy" but should reserve possible renunciation of citizenship for a later date when noncitizenship might carry tax advantages.

Nor can we accept the contention that because the Passport Office knew as early as 1953 of Mrs. Burns' Mexican citizenship certificate, the government failed to establish detrimental reliance on her numerous statements under oath that she was a United States citizen. This conveniently ignores the fact that, based upon her representations of citizenship, Mrs. Burns applied for and was granted at least three passports prior to 1953. Furthermore the United States Passport Office, contrary to appellant's contention, Brief at 34, was satisfied that the Mexican Government, considering Mrs. Burns a Mexican citizen by marriage, did not require her United States expatriation, with the result that she "possessed dual nationality." Memo of Mr. Curry, Passport Division, Mar. 23, 1953. This belief was not contradicted by Mexican officials or by Matheson in 1953 when he took Mrs. Burns' case before the Passport Office.

Thus Mrs. Burns' and Matheson's affirmations of her United States citizenship were directly relevant to the Passport Office's inquiry concerning her eligibility for a United States passport and to all similar subsequent determinations by American agencies running favorably to Mrs. Burns. Mrs. Burns and her estate cannot simply "blow hot and cold" in their dealings with the government, *Callanan Road Improvement Co. v. United States,* 345 U.S. 507, 513, 73 S.Ct. 803, 806, 97 L.Ed. 1206, 1211 (1953). At this late date her estate is estopped to deny this long line of representations of decedent's United States citizenship.

*Laches*

█ In any event appellant is barred by laches from raising the issue of Mrs. Burns' expatriation in either his direct suit for a tax refund or as a defense to the government's suit for a deficiency. For over 24 years Mrs. Burns and appellant had many opportunities, when her United States citizenship was questioned, to assert or seek an adjudication that she had expatriated herself. However, on the contrary, she chose not only to represent that she was a United States citizen but to receive the benefits and perform the duties (including payment of taxes) of an American citizen. Having waited until Mrs. Burns' death, thereby preventing the government from calling her as a witness to contradict appellant's present position or even to explain her contrary behavior throughout her lifetime, appellant is precluded by his long delay from now asserting for the first time that she lost her United States citizenship in 1944. In a similar context, when a wife challenged the 1948 naturalization of her husband as a United States citizen, we in *Simons v. United States,* 452 F.2d 1110, 1116–17 (2d Cir. 1971), held that she was precluded by laches from asserting such a contention, stating:

"If we entertained a different view on the points so far discussed, we would nevertheless affirm the order of dismissal and denial, on the ground of laches. Both the complaint and the motion turn on John Simons' intention to reside in the United States when he and his wife petitioned for naturalization . . . 22 years before these proceedings were

brought. His testimony would have been of the utmost importance. . . . If the facts were as Mrs. Simons now represents, they must have been known to her long ago. The papers reveal no reason for the inordinate and prejudicial delay. . . . Apparently Mrs. Simons was quite content with the situation until the divorce in 1964; even then she did nothing until her husband's death in 1968 opened new vistas at a time when contradiction by him was no longer possible."

■ Appellant argues that the government, having collected over $190,000 in gift and income taxes from Mrs. Burns during her lifetime, cannot demonstrate any prejudice from the estate's delay in challenging decedent's citizenship. We disagree. The government is prejudiced because in seeking to collect taxes ordinarily owed it by United States citizens it is compelled to rebut an allegation of expatriation that is now over 30 years stale, with the key witness, Mrs. Burns, unavailable either to contradict this allegation or to explain her inconsistent conduct in the years following 1944. That Mrs. Burns paid sizeable gift and income taxes during her lifetime does not therefore alter the equitable considerations favoring the government. A citizen's duties to pay taxes are neither fungible nor divisible. The government is entitled to all taxes due from its citizens' estates.

The order of the district court is affirmed.