# Survey of the Law of Expatriation

Expatriating a U.S. citizen subject to the Citizenship Clause of the Fourteenth Amendment on the ground that, after reaching the age of 18, the person has obtained foreign citizenship or declared allegiance to a foreign state generally will not be possible absent substantial evidence, apart from the act itself, that the individual specifically intended to relinquish U.S. citizenship. An express statement of renunciation of U.S. citizenship would suffice.

An intent to renounce citizenship can be inferred from the act of serving in the armed forces of a foreign state engaged in hostilities against the United States.

June 12, 2002

MEMORANDUM OPINION FOR THE SOLICITOR GENERAL

You have asked us for a general survey of the laws governing loss of citizenship, a process known as "expatriation" (also known within the specific context of naturalized citizens as "denaturalization"). *See, e.g.*, *Perkins v. Elg*, 307 U.S. 325, 334 (1939) ("Expatriation is the voluntary renunciation or abandonment of nationality and allegiance."). Part I of this memorandum provides a general description of the expatriation process. Part II notes the relative difficulty of expatriating a person on the grounds that he has either obtained naturalization in, or declared allegiance to, a foreign state, absent evidence of a specific intention to relinquish U.S. citizenship apart from the act of naturalization or declaration itself. Part III analyzes the expatriation of a person who serves in a foreign armed force engaged in hostilities against the United States.[1]

## I. Law of Expatriation

It is now well settled that anyone may renounce his United States citizenship.[2] "In 1794 and 1797, many members of Congress still adhered to the English doctrine of perpetual allegiance and doubted whether a citizen could even voluntarily renounce his citizenship. By 1818, however, almost no one doubted the existence of the right of voluntary expatriation . . . ." *Afroyim v. Rusk*, 387 U.S. 253, 258 (1967) (footnote omitted).[3] In 1868, Congress declared that "the right of

---

[1] Editor's Note: The original footnote 1 has been removed in order to preserve the confidentiality of internal government deliberations.

[2] Hundreds of American citizens renounce their citizenship every year. *See* Richard A. Westin, *Expatriation and Return: An Examination of Tax-Driven Expatriation by United States Citizens, and Reform Proposals*, 20 Va. Tax Rev. 75, 98 (2000) (listing annual renunciation rates for 1980-1994).

[3] *See also Right of Expatriation*, 9 Op. Att'y Gen. 356, 358 (1859) ("the general right, in one word, of expatriation, is incontestible"); *Savorgnan v. United States*, 338 U.S. 491, 497 (1950) ("Traditionally the United States has supported the right of expatriation as a natural and inherent right of all people."); *Nishikawa v. Dulles*, 356 U.S. 129, 139 (1958) (Black, J., concurring) ("Of course a citizen has the

expatriation is a natural and inherent right of all people, indispensable to the enjoyment of the rights of life, liberty, and the pursuit of happiness." Act of July 27, 1868, ch. 249, pmbl., 15 Stat. 223, 223; *see also* 8 U.S.C. § 1481 note (2000) (quoting Rev. Stat. § 1999 (2d. ed. 1878), 18 Stat. pt. 1, at 350 (repl. vol.)) (same). That declaration further stated that "any declaration, instruction, opinion, order, or decision of any officers of this government which denies, restricts, impairs, or questions the right of expatriation, is hereby declared inconsistent with the fundamental principles of this government." 15 Stat. at 224. Similarly, the Burlingame Treaty of 1868 between the United States and China recognized "the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of . . . free migration and emigration . . . for purposes of curiosity, of trade, or as permanent residents." U.S.-China, art. 5, July 28, 1868, 16 Stat. 739, 740. Congress provided specific legislative authority for nullifying citizenship when, in 1907, it enacted the predecessor of the modern federal expatriation statute. *See* Act of Mar. 2, 1907, ch. 2534, 34 Stat. 1228. As the Supreme Court has noted, such acts of Congress "are to be read in the light of [Congress's 1868] declaration of policy favoring freedom of expatriation which stands unrepealed." *Savorgnan v. United States*, 338 U.S. 491, 498-99 (1950).

By virtue of its express power "[t]o establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, Congress has an implied power to set the terms of U.S. citizenship, including the power to expatriate.[4] But that power is limited by

---

right to abandon or renounce his citizenship . . . ."); *Lozada Colon v. Dep't of State*, 2 F. Supp. 2d 43, 45 (D.D.C. 1998) (assuming that "an individual has a fundamental right to expatriate").

[4] It was once thought that, because the Naturalization Clause contained no express provision for congressional power to expatriate a U.S. citizen against his will, no such authority existed. U.S. Const. art. I, § 8, cl. 4. As Chief Justice Marshall stated in dictum in *Osborn v. Bank of the United States*, 22 U.S. (9 Wheat.) 738 (1824), "[a] naturalized citizen . . . becomes a member of the society, possessing all the rights of a native citizen, and standing, in the view of the constitution, on the footing of a native. The constitution does not authorize Congress to enlarge or abridge those rights. The simple power of the national legislature is, to prescribe a uniform rule of naturalization, and the exercise of this power exhausts it, so far as respects the individual." *Id*. at 827. In *Perez v. Brownell*, 356 U.S. 44 (1958), the Court found an inherent federal power, beyond the express terms of the Constitution, to forcibly expatriate U.S. citizens, as a necessary attribute of sovereignty. *Id*. at 57 (concluding that power to expatriate necessarily arose out of federal power to conduct foreign relations (citing *United States v. Curtiss-Wright Export Corp*., 299 U.S. 304, 318 (1936))). That view was abrogated, however, in *Afroyim*. 387 U.S. at 257 ("This power cannot, as *Perez* indicated, be sustained as an implied attribute of sovereignty possessed by all nations. . . . Our Constitution governs us and we must never forget that our Constitution limits the Government to those powers specifically granted or those that are necessary and proper to carry out the specifically granted ones.").

Under the Court's current jurisprudence, the Naturalization Clause empowers Congress to expatriate U.S. citizens without obtaining their consent, but only with respect to naturalized citizens who fall outside the protection of the Citizenship Clause of the Fourteenth Amendment. Individuals not protected by the Citizenship Clause acquire U.S. citizenship, if at all, solely by an act of Congress enacted pursuant to the Naturalization Clause, and not pursuant to the Constitution itself. *See Rogers v. Bellei*, 401 U.S. 815, 830 (1971) (Citizenship Clause does "'not touch[] the acquisition of citizenship by being born abroad of American parents; and has left that subject to be regulated, as it had always

the Citizenship Clause of the Fourteenth Amendment. That provision states that "[a]ll persons born or naturalized in the United States and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside." U.S. Const. amend. XIV, § 1.[5] As that clause has been construed by the Supreme Court at least since 1967, the United States may not deprive a person "born or naturalized in the United States" of his U.S. citizenship "'unless he voluntarily relinquishes it.'" *Vance v. Terrazas*, 444 U.S. 252, 260 (1980) (quoting *Afroyim*, 387 U.S. at 262).[6] Forced expatriation has also been thought to violate other provisions of the Constitution. *See Trop v. Dulles*, 356 U.S. 86, 101, 102, 103 (1958) (plurality opinion) ("[U]se of denationalization as a punishment is barred by the Eighth Amendment. . . . The civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime. . . . [T]he Eighth Amendment forbids Congress to punish by taking away citizenship . . . ."); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165-66 (1963) (striking down as unconstitutional "the sanction of deprivation of nationality as a punishment . . . without affording the procedural safeguards guaranteed by the Fifth and Sixth Amendments"). Accordingly, at least since the Supreme Court's ruling in *Afroyim v. Rusk*, 387 U.S. 253 (1967), it is no longer constitutionally sufficient that a person who was born or naturalized in the United States has voluntarily engaged in conduct deemed by law to be an act of expatriation. The person must also undertake such an act with the specific intention to relinquish his U.S.

---

been, by Congress, in the exercise of the power conferred by the Constitution to establish an uniform rule of naturalization'") (quoting *United States v. Wong Kim Ark*, 169 U.S. 649, 688 (1898)); *see also infra* note 6. With respect to such individuals, Congress's power under the Naturalization Clause includes the power to set conditions subsequent to naturalization, failure of which may result in expatriation without consent. *See Bellei*, 401 U.S. at 834 ("it does not make good constitutional sense, or comport with logic, to say, on the one hand, that Congress [in exercising its authority under the Naturalization Clause] may impose a condition precedent, with no constitutional complication, and yet be powerless to impose precisely the same condition subsequent").

[5] By its express terms, the Citizenship Clause does not protect persons who acquire U.S. citizenship by virtue of being born abroad to parents, at least one of whom is a U.S. citizen, because such persons are not "born or naturalized *in* the United States." U.S. Const. amend. XIV, § 1 (emphasis added). *See Rogers v. Bellei*, 401 U.S. 815, 827 (1971).

[6] Prior to *Afroyim*, the Court had held precisely the opposite view—namely, that nothing in the Constitution prevents U.S. citizens from forfeiting their citizenship, against their will, for voluntarily engaging in certain kinds of conduct, such as voting in a foreign election. That view was restated most recently in *Perez v. Brownell*, 356 U.S. 44 (1958). *See, e.g., id.* at 58 n.3; *id.* at 61; *see also Mackenzie v. Hare*, 239 U.S. 299, 312 (1915); *Savorgnan*, 338 U.S. at 499-500. Three justices who dissented in *Perez*, however, concluded that the Citizenship Clause prohibits expatriation absent the citizen's assent. *See Perez*, 356 U.S. at 66 (Warren, C.J., dissenting). In 1967, the Court expressly overruled *Perez* by a 5-4 vote in *Afroyim. See Afroyim*, 387 U.S. at 257 ("we reject the idea expressed in *Perez* that . . . Congress has any general power, express or implied, to take away an American citizen's citizenship without his assent"); *id.* at 262-63 (noting that primary purpose of the Citizenship Clause was to prevent Congress from stripping blacks of U.S. citizenship). Not a single justice suggested a return to *Perez* when the Court revisited the issue of expatriation in 1980. *See Vance v. Terrazas*, 444 U.S. 252 (1980).

citizenship. *See Terrazas*, 444 U.S. at 263 (requiring that "the expatriating act [be] accompanied by an intent to terminate United States citizenship"). "[B]ecause of the precious nature of citizenship, it can be relinquished only voluntarily, and not by legislative fiat." *Jolley v. INS*, 441 F.2d 1245, 1248 (5th Cir. 1971).

Under current federal law, any party claiming that a person has abandoned his U.S. citizenship must establish three elements. *See* 8 U.S.C. § 1481 (2000). First, the person must take one of the statutorily enumerated acts of expatriation, such as "obtaining naturalization in" or "taking an oath or making an affirmation or other formal declaration of allegiance to a foreign state" after reaching the age of 18, "entering, or serving in, the armed forces of a foreign state . . . engaged in hostilities against the United States," or formal renunciation before an appropriate United States official. 8 U.S.C. § 1481(a).[7] Second, he must act "voluntarily." *Id*. *See also Nishikawa*, 356 U.S. at 133 ("no conduct results in expatriation unless the conduct is engaged in voluntarily"). Third, he must act "with the intention of relinquishing United States nationality." 8 U.S.C. § 1481(a).[8] Expatriation occurs "at the time the expatriating acts were committed, not at the time his alienage was judicially determined." *United States ex rel. Marks v. Esperdy*, 315 F.2d 673, 676 (2d Cir. 1963), *aff'd by an equally divided court*, 377 U.S. 214 (1964); *see also* 8 U.S.C. § 1488 (2000) ("The loss of nationality under this part shall result solely from the performance by a national of the acts or fulfillment of the conditions specified in this part.").

Formal renunciation[9] is therefore not the only way in which a U.S. citizen may express his "intention of relinquishing United States nationality." 8 U.S.C.

---

[7] The statute's list of acts of expatriation appears to be exhaustive. *See* 8 U.S.C. § 1488 (2000) ("The loss of nationality under this part shall result solely from the performance by a national of the acts or fulfillment of the conditions specified in this part."). *But see Kawakita v. United States*, 343 U.S. 717, 731-32 (1952) (declining to resolve whether other acts of expatriation may be available).

[8] Additional restrictions on expatriation, not apparently relevant here, are enumerated in 8 U.S.C. § 1483 (2000). First, "[e]xcept as provided in paragraphs (6) and (7) of section 1481(a) of this title, no national of the United States can lose United States nationality under this chapter while within the United States or any of its outlying possessions, but loss of nationality shall result from the performance within the United States or any of its outlying possessions of any of the acts or the fulfillment of any of the conditions specified in this Part if and when the national thereafter takes up a residence outside the United States and its outlying possessions." 8 U.S.C. § 1483(a). Second, "[a] national who within six months after attaining the age of eighteen years asserts his claim to United States nationality, in such manner as the Secretary of State shall by regulation prescribe, shall not be deemed to have lost United States nationality by the commission, prior to his eighteenth birthday, of any of the acts specified in paragraphs (3) and (5) of section 1481(a) of this title." 8 U.S.C. § 1483(b).

[9] Federal law establishes two separate mechanisms through which an individual may formally renounce U.S. citizenship. First, a citizen may make a formal renunciation of U.S. nationality "before a diplomatic or consular officer of the United States *in a foreign state*, in such form as may be prescribed by the Secretary of State." 8 U.S.C. § 1481(a)(5) (emphasis added). *See also* 22 C.F.R. § 50.50(a) (2001) ("A person desiring to renounce U.S. nationality under section 349(a)(5) of the Immigration and Nationality Act [8 U.S.C. § 1481(a)(5)] shall appear before a diplomatic or consular officer of the

§ 1481(a). An intention to abandon citizenship can also be manifested through various categories of conduct. *See Terrazas*, 444 U.S. at 260 ("intent to relinquish citizenship . . . [can be] expressed in words or . . . found as a fair inference from proved conduct"); *Expatriation—Effect of Afroyim v. Rusk*, *387 U.S. 253*, 42 Op. Att'y Gen. 397, 400 (1969) ("'Voluntary relinquishment' of citizenship is not confined to a written renunciation . . . . It can also be manifested by other actions declared expatriative under the act . . . ."). Thus, although the performance of an expatriating act cannot be used as "the equivalent of or as conclusive evidence of the indispensable voluntary assent of the citizen," the Supreme Court has held that such conduct "may be highly persuasive evidence in the particular case of a purpose to abandon citizenship." *Terrazas*, 444 U.S. at 261 (quotations omitted). So long as "the trier of fact . . . conclude[s] that the citizen not only voluntarily committed the expatriating act prescribed in the statute, but also intended to relinquish his citizenship," the statutory requirements for expatriation have been met. *Id.* Lower courts have similarly held that "specific subjective intent to

---

United States in the manner and form prescribed by the Department."). By its terms, renunciation under 8 U.S.C. § 1481(a)(5) can only occur outside the United States. For purposes of this provision,

> [t]he State Department has issued a form, "Oath of Renunciation of the Nationality of the United States" (the "oath") for the purpose of enabling formal renunciation to occur. The renunciant must sign the oath and swear to its contents. The renunciant must swear that "I desire to make a formal renunciation of my American nationality, as provided by section 349(a)(5) of the Immigration and Nationality Act [8 U.S.C. § 1481(a)(5)] and pursuant thereto I hereby absolutely and entirely renounce my United States nationality together with all rights and privileges and all duties of allegiance and fidelity thereunto pertaining." The oath is accompanied by a "Statement of Understanding" (the "statement"), which the renunciant must also sign. The statement declares, in part, that "Upon renouncing my citizenship I will become an alien with respect to the United States, subject to all the laws and procedures of the United States regarding entry and control of aliens," that "If I do not possess the nationality of any country other than the United States, upon my renunciation I will become a stateless person and may face extreme difficulties in traveling internationally and entering most countries." The statement also permits or invites the renunciant to "make a separate written explanation of my reasons for renouncing my United States citizenship." The executed papers are then forwarded to the State Department together with a diplomatic or consular report.

Letter for Catherine W. Brown, Assistant Legal Adviser for Consular Affairs, Department of State, from Todd David Peterson, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Voluntary Expatriation of Puerto Rican Nationalists* at 1-2 (Oct. 31, 1997).

Alternatively, a citizen may formally renounce "in such form as may be prescribed by, and before such officer as may be designated by, the Attorney General, whenever the United States shall be in a state of war and the Attorney General shall approve such renunciation as not contrary to the interests of national defense." 8 U.S.C. § 1481(a)(6). This provision appears to permit formal renunciation within the United States. Although there is currently no regulation for accepting a formal renunciation within the United States pursuant to this provision, we believe that no such regulation is necessary. The statute only states that the Attorney General shall prescribe a "form" for renunciation pursuant to 8 U.S.C. § 1481(a)(6). We see no reason why such a form could not be produced at the time a U.S. citizen seeks renunciation pursuant to that provision.

renounce United States citizenship . . . may [be] prove[d] . . . by evidence of an explicit renunciation, acts inconsistent with United States citizenship, or by affirmative voluntary act[s] clearly manifesting a decision to accept [foreign] nationality." *King v. Rogers*, 463 F.2d 1188, 1189 (9th Cir. 1972) (citations and quotations omitted). "Specific intent may . . . be proven by evidence of what steps the alleged expatriate did or did not take in connection with his expatriating acts." *United States v. Schiffer*, 831 F. Supp. 1166, 1194 (E.D. Pa. 1993), *aff'd without op.*, 31 F.3d 1175 (3d Cir. 1994).

The party claiming that a person has lost his U.S. citizenship has the burden to prove by a preponderance of the evidence the performance of an act of expatriation and the intention to relinquish citizenship. 8 U.S.C. § 1481(b); *Terrazas*, 444 U.S. at 268; *see also id.* at 264-67 (upholding preponderance of the evidence standard of proof against constitutional attack). Although any person who performs an act of expatriation is presumed to have done so voluntarily, that presumption can be rebutted with proof by a preponderance of the evidence that the act was performed involuntarily. 8 U.S.C. § 1481(b); *see also Terrazas*, 444 U.S. at 267-70 (upholding voluntariness presumption against constitutional attack).

Factual doubts in expatriation cases "are to be resolved in favor of citizenship." *Bruni v. Dulles*, 235 F.2d 855, 856 (D.C. Cir. 1956). *See also Nishikawa*, 356 U.S. at 136 ("Rights of citizenship are not to be destroyed by an ambiguity.") (quoting *Elg*, 307 U.S. at 337); *Nishikawa*, 356 U.S. at 136 ("evidentiary ambiguities are not to be resolved against the citizen"). In cases of legal ambiguity, we have previously concluded that the State Department has, as the agency charged with the implementation of the expatriation statute, the discretion to select from among reasonable interpretations of the statute. Letter for Catherine W. Brown, Assistant Legal Adviser for Consular Affairs, Department of State, from Todd David Peterson, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Voluntary Expatriation of Puerto Rican Nationalists* at 3 (Oct. 31, 1997) (concluding that *Chevron* deference applies to State Department decisions "to apply the construction of the statute that it believes is most consistent with the policies underlying the statute"). *But see Savorgnan*, 338 U.S. at 498-99 (concluding that expatriation statutes "are to be read in the light of [Congress's 1868] declaration of policy favoring freedom of expatriation which stands unrepealed").

The issue of expatriation can arise in litigation in a number of different ways. "Since United States citizenship is considered by most to be a prized status, it is usually the government which claims that the citizen has lost it, over the vigorous opposition of the person facing the loss." *United States v. Matheson*, 532 F.2d 809, 811 (2d Cir. 1976). Moreover, the Executive Branch need not seek a judicial determination that a particular individual has expatriated. It can simply treat that individual as an alien by denying him a right of U.S. citizenship and, if that action is challenged in court, defend that action on the ground that the individual is no

longer a U.S. citizen. For example, any individual who is issued a certificate of loss of citizenship by the State Department pursuant to 8 U.S.C. § 1501 (2000),[10] or who is denied a right or privilege of a U.S. citizen by a government agency (such as a U.S. passport, *see, e.g.*, *Nishikawa*, 356 U.S. at 131) on the ground that he is not a citizen of the United States, may file a declaratory judgment action in federal court under 28 U.S.C. § 2201 for a declaration that he is in fact a national of the United States. 8 U.S.C. § 1503(a) (2000). *See, e.g.*, *Terrazas*, 444 U.S. at 256 (section 1503 suit filed following issuance of certificate of loss of nationality). Alternatively, a person might claim U.S. citizenship through a petition for a writ of habeas corpus challenging, for example, a deportation action. *See, e.g.*, *Marks*, 315 F.2d at 675.[11]

On the other hand, a U.S. citizen who is accused of treason might claim that he had renounced his U.S. citizenship before undertaking his allegedly treasonous acts and was therefore legally incapable of committing the crime of treason against

---

[10] Under federal law, "[w]henever a diplomatic or consular officer of the United States has reason to believe that a person while in a foreign state has lost his United States nationality under [8 U.S.C. §§ 1481-1489], he shall certify the facts upon which such belief is based to the Department of State, in writing, under regulations prescribed by the Secretary of State [currently codified at 22 C.F.R. §§ 50.40(b)-(e), 50.50(b), 50.51 (2001)]." 8 U.S.C. § 1501 (2000). *See also* 22 C.F.R. §§ 50.40(c) (2001) (same).

For purposes of these provisions, a "consular officer" is "any consular, diplomatic, or other officer or employee of the United States designated under regulations prescribed under authority contained in this chapter, for the purpose of issuing immigrant or nonimmigrant visas or, when used in subchapter III of this chapter [8 U.S.C. § 1401-1504] for the purpose of adjudicating nationality." 8 U.S.C. § 1101(a)(9) (2000). The regulations governing the adjudication of nationality, 22 C.F.R. §§ 50.1 to 50.51, do not appear to define "consular officer." According to the regulations governing the issuance of immigrant or nonimmigrant visas (which do not apply to the regulations governing the adjudication of nationality), the term "[c]onsular officer . . . includes commissioned consular officers and the Deputy Assistant Secretary for Visa Services, and such other officers as the Deputy Assistant Secretary may designate for the purpose of issuing nonimmigrant and immigrant visas, but does not include a consular agent, an attache or an assistant attache. . . . [T]he term 'other officers' includes civil service visa examiners employed by the Department of State for duty at visa-issuing offices abroad, upon certification by the chief of the consular section under whose direction such examiners are employed that the examiners are qualified by knowledge and experience to perform the functions of a consular officer in the issuance or refusal of visas. . . . The assignment by the Department of any foreign service officer to a diplomatic or consular office abroad in a position administratively designated as requiring, solely, partially, or principally, the performance of consular functions, and the initiation of a request for a consular commission, constitutes designation of the officer as a 'consular officer' within the meaning of [8 U.S.C. § 1101(a)(9)]." 22 C.F.R. § 40.1(d) (2001).

[11] In addition, any United States Attorney can file an action in federal court "for the purpose of revoking and setting aside the order admitting [a] person to citizenship and canceling the certificate of naturalization" previously granted to a person seeking U.S. citizenship. 8 U.S.C. § 1451(a) (2000). Such denaturalization actions are appropriate where "such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation," and thus are not directly related to expatriation. *Id*. Nevertheless, expatriation issues have been squarely raised during the course of denaturalization proceedings, for example, to explain the circumstances causing a natural born citizen to seek naturalization in the first place. *See, e.g.*, *Schiffer*, 831 F. Supp. at 1169.

the United States. The assertion of such a defense would require a court to determine whether or not the defendant had in fact renounced his citizenship. *See, e.g.*, *Kawakita v. United States*, 343 U.S. 717, 722 (1952) (noting defense argument that acquittal on treason charge is required "since his duty of allegiance would have ceased with the termination of his American citizenship"). Similarly, one might claim loss of citizenship to avoid liability under U.S. tax laws. *See, e.g.*, *Matheson*, 532 F.2d at 811 ("Here the estate of a wealthy deceased United States citizen seeks to establish over the government's opposition that she expatriated herself. As might be suspected, the reason is several million dollars in tax liability, which the estate might escape if it could sustain the burden of showing that the deceased lost her United States citizenship.").

## II. Foreign Naturalization or Declaration of Foreign Allegiance

Under federal law, a U.S. citizen can lose his nationality if he voluntarily "obtain[s] naturalization in a foreign state . . . after having attained the age of eighteen years." 8 U.S.C. § 1481(a)(1). Likewise, a citizen of the United States could be expatriated if he voluntarily "tak[es] an oath or mak[es] an affirmation or other formal declaration of allegiance to a foreign state or a political subdivision thereof, after having attained the age of eighteen years." *Id*. § 1481(a)(2). In either case, however, no loss of citizenship may result unless the citizen acts "with the intention of relinquishing United States nationality." *Id*. § 1481(a).

The most common obstacle to expatriation in cases involving foreign naturalization or declaration of foreign allegiance is sufficient proof of a specific intention to renounce U.S. citizenship. Intent need not be proved with direct evidence, to be sure. It can be demonstrated circumstantially through conduct. Thus, in some cases, such as service in a hostile foreign military at war with the United States, the act of expatriation itself may even constitute "highly persuasive evidence . . . of a purpose to abandon citizenship." *Terrazas*, 444 U.S. at 261 (quotations omitted). *See generally infra* Part III. Because, however, both foreign naturalization and declaration of foreign allegiance are, with respect to U.S. citizenship, more ambiguous acts, they constitute weaker evidence of "a purpose to abandon citizenship." *Terrazas*, 444 U.S. at 261 (quotations omitted).

Dual nationality, the Supreme Court has explained, is "a status long recognized in the law." *Kawakita*, 343 U.S. at 723. *See also id*. at 734 ("Dual nationality . . . is the unavoidable consequence of the conflicting laws of different countries. One who becomes a citizen of this country by reason of birth retains it, even though by the law of another country he is also a citizen of it.") (citation omitted); *Savorgnan*, 338 U.S. at 500 (although "[t]he United States has long recognized the general undesirability of dual allegiances[,] . . . [t]emporary or limited duality of citizenship has arisen inevitably from differences in the laws of the respective nations as to when naturalization and expatriation shall become effective"); *Elg*,

307 U.S. at 329 ("As municipal law determines how citizenship may be acquired, it follows that persons may have a dual nationality."). The mere assertion by an individual of citizenship in one country thus need not manifest an intention to relinquish citizenship in another country, for "[t]he concept of dual citizenship recognizes that a person may have and exercise rights of nationality in two countries and be subject to the responsibilities of both. The mere fact that he asserts the rights of one citizenship does not without more mean that he renounces the other." *Kawakita*, 343 U.S. at 723-24.

Current federal regulations thus establish an administrative presumption under which "U.S. citizens who naturalize in" or "take a routine oath of allegiance" to a foreign country "need not submit evidence of intent to retain U.S. nationality." 22 C.F.R. § 50.40(a). In such cases, "intent to retain U.S. citizenship will be presumed." *Id.* "In other loss of nationality cases," by contrast, such as those involving service in a hostile foreign military, federal regulations erect no such presumption; instead, "the consular officer will ascertain whether or not there is evidence of intent to relinquish U.S. nationality." *Id.*

Relevant case law reflects a similarly cautious attitude towards expatriation based on foreign naturalization or declaration of foreign allegiance. In a number of cases, courts have held that a declaration of foreign allegiance was alone insufficient to manifest an intention to renounce U.S. citizenship, because such assertions are frequently consistent with the maintenance of dual U.S.-foreign citizenship. In *Kawakita*, for example, the Supreme Court held that the defendant, a dual Japanese-U.S. national, had failed even to commit an act of expatriation, let alone manifest the requisite intention to renounce, even though he had expressed his allegiance to Japan. The Court noted that, because "all Japanese nationals, whether or not born abroad, are duty bound [under then-Japanese law] to Japanese allegiance," the mere act of "registering in the Koseki [an official Japanese census register] is 'not necessarily a formal declaration of allegiance but merely a reaffirmation of an allegiance to Japan which already exists.'" 343 U.S. at 724 (quoting expert deposition).[12]

Likewise, in *United States v. Matheson*, 532 F.2d 809 (2d Cir. 1976), the Second Circuit affirmed the U.S. citizenship of the decedent, Dorothy Gould

---

[12] Mr. Kawakita had been tried and convicted of treason for beating and inflicting other acts of cruelty upon American prisoners of war held in Japan. *Id.* at 737-40. The Supreme Court affirmed the conviction after rejecting Kawakita's contention that he was no longer a U.S. citizen and therefore did not owe allegiance to the United States, one of the elements of a treason offense. *Id.* at 722. As noted above, Kawakita failed to persuade the Court that his expression of allegiance to Japan constituted grounds for expatriation. In addition, the Court rejected Kawakita's argument that he had effectively "serv[ed] in the Japanese armed services," another statutorily enumerated act of expatriation. *Id.* at 727 (quotations omitted). The Court instead found that Kawakita was merely an interpreter employed by a private Japanese company, and not a soldier in the Japanese army, for purposes of the expatriation statute. *Id.* ("Though petitioner took orders from the military, he was not a soldier in the armed services . . . . His employment was as an interpreter for . . . a private company.").

Burns, a U.S. natural born citizen who later became a Mexican citizen by virtue of her marriage to a Mexican national, even though she had sworn an oath stating that "I expressly renounce all protection foreign to said laws and authorities [of Mexico] and any right which treaties or international law grant to foreigners, expressly furthermore agreeing not to invoke with respect to the Government of the Republic [of Mexico] any right inherent in my nationality of origin." *Id*. at 816. The court first noted that "there must be proof of a specific intent to relinquish United States citizenship before an act of foreign naturalization or oath of loyalty to another sovereign can result in the expatriation of an American citizen." *Id*. at 814. Applying that rule, the court concluded that Burns's oath expressed "merely a subscription to a basic principle of international law governing dual nationality: that a national of one country (e.g., United States) may not look to it for protection while she is in another country (e.g., Mexico), of which she is also a national," a principle that "has repeatedly been recognized by the Supreme Court of the United States." *Id*. at 816. The court further noted that

> [h]ad Mrs. Burns wished to expatriate herself she could simply have unequivocally stated that she renounced her American citizenship. Instead, she used language to the effect that as a Mexican national she could not claim her rights as a United States citizen 'with respect to the Government of the Republic [of Mexico] . . . .' This limited surrender did not preclude her from claiming rights as a United States citizen outside of Mexico. Indeed, once outside of Mexico she did not hesitate, consistent with this interpretation of her 1944 declaration, to invoke important rights and privileges inherent in her United States birthright. Thus we must conclude that the 1944 declaration amounted to nothing more than a statement of dual nationality.

*Id*. (citations omitted). The Ninth Circuit concluded in *King v. Rogers*, 463 F.2d 1188 (9th Cir. 1972), that Elihu King was no longer a U.S. citizen. The court noted that, "to obtain British naturalization, King took an oath of allegiance to Queen Elizabeth II." *Id*. at 1189. That act "alone," however, was "insufficient to prove renunciation," although it did "provide[] substantial evidence of intent." *Id*. To reach its ultimate conclusion that Mr. King had renounced his U.S. citizenship, the court relied on other statements in which he demonstrated that he considered himself no longer to be a U.S. citizen as the result of his British naturalization. *See id*. at 1190 ("These statements indicate that while King never formally renounced his United States citizenship, he intended to do so when he became a naturalized British subject, and that he would do so at any time to 'simplify' matters."). *See also In re Balsamo*, 306 F. Supp. 1028, 1033 (N.D. Ill. 1969) (although "[n]early all sovereignties recognize that acquisition of foreign nationality ordinarily shows a renunciation of citizenship," the Constitution requires that one "voluntarily

abandon or relinquish his United States citizenship"); *cf. Baker v. Rusk*, 296 F. Supp. 1244, 1246 (C.D. Cal. 1969) ("It would seem evident that any time a person takes an oath of allegiance to the sovereign of the country in which he is then residing, he gives substantial indication that he considers himself to be a national of that country and that he has relinquished any prior citizenship. However, this is not inevitably so . . . .").

An oath of allegiance to a foreign country that includes an express statement of intention to renounce United States citizenship is likely to result in expatriation. For example, in *Terrazas v. Haig*, 653 F.2d 285 (7th Cir. 1981), the Seventh Circuit concluded that Laurence Terrazas, a U.S. natural born citizen who had also acquired Mexican citizenship at birth by virtue of his father's Mexican citizenship, had adequately manifested an intention to renounce when, at age 22, he executed an application for a certificate of Mexican nationality. *Id.* at 286. That application, the court concluded, contained a statement not only asserting foreign nationality, but also expressly renouncing United States citizenship:

> I therefore hereby expressly renounce _____ citizenship, as well as any submission, obedience, and loyalty to any foreign government, especially to that of _____, of which I might have been subject, all protection foreign to the laws and authorities of Mexico, all rights which treaties or international law grant to foreigners; and further-more I swear adherence, obedience, and submission to the laws and authorities of the Mexican Republic.

*Terrazas*, 444 U.S. at 255 n.2. "The blank spaces in the statement were filled in with the words 'Estados Unidos' (United States) and 'Norteamerica' (North America), respectively." *Id.* The court thus concluded that "there is abundant evidence that plaintiff intended to renounce his United States citizenship when he acquired the Certificate of Mexican Nationality willingly, knowingly, and voluntarily." *Terrazas*, 653 F.2d at 288. In addition to the statement itself, the court noted, *inter alia*, the timing of Terrazas's actions, which suggested that he was attempting to avoid U.S. military service. *Id.* at 288-89. Terrazas also never took steps to reverse his application, even after he had received his certificate of Mexican nationality, *id.* at 288, which also expressly recited his renunciation of any other citizenship, *id.* at 286.

In sum, expatriating an individual on the ground that, after reaching the age of 18, a person has obtained foreign citizenship or declared allegiance to a foreign state generally will not be possible absent substantial evidence, apart from the act itself, that the individual specifically intended to relinquish U.S. citizenship. An express statement of renunciation of U.S. citizenship would suffice.

## III. Service in a Hostile Foreign Armed Force

An individual who voluntarily "enter[s], or serv[es] in, the armed forces of a foreign state"[13] may be expatriated, "if (A) such armed forces are engaged in hostilities against the United States, or (B) such persons serve as a commissioned or non-commissioned officer." 8 U.S.C. § 1481(a)(3). Nonetheless, no person may be expatriated unless he acts "with the intention of relinquishing United States nationality." 8 U.S.C. § 1481(a). That said, although the performance of an expatriating act cannot be used as "the equivalent of or as conclusive evidence of the indispensable voluntary assent of the citizen," such conduct "may be highly persuasive evidence in the particular case of a purpose to abandon citizenship." *Terrazas*, 444 U.S. at 261 (quotations omitted).

Voluntary service in a foreign armed force that is engaged in hostilities against the United States has frequently been viewed as a particularly strong manifestation of an intention to abandon citizenship. As Attorney General Clark once opined, "it is highly persuasive evidence, to say the least, of an intent to abandon United States citizenship if one enlists voluntarily in the armed forces of a foreign government engaged in hostilities against the United States." *Expatriation*, 42 Op. Att'y Gen. at 401. *See also* 22 C.F.R. § 50.40(a) (although "intent to retain U.S. citizenship will be presumed" when an individual "naturalize[s] in a foreign country" or "take[s] a routine oath of allegiance," no such presumption is provided "[i]n other loss of nationality cases").

Lower federal courts have expressed a similar view. It bears noting that most of the cases involving expatriation on the ground of service in a foreign armed force were decided prior to 1967,[14] when the Supreme Court announced in *Afroyim v. Rusk*, 387 U.S. 253 (1967), that the Citizenship Clause of the Fourteenth Amendment protects all individuals "born or naturalized in the United States" against expatriation absent a demonstration of specific intention to relinquish U.S. citizenship. In at least two relatively recent decisions, however, courts have concluded that the requisite intention to renounce U.S. citizenship can be *inferred* from the act of serving in an armed force engaged in hostilities against the United States.

In *United States v. Schiffer*, 831 F. Supp. 1166 (E.D. Pa. 1993), *aff'd without op.*, 31 F.3d 1175 (3d Cir. 1994), the government brought a denaturalization action against Nikolaus Schiffer, a U.S.-born citizen who had previously been expatriated

---

[13] Assuming that the Taliban represents the "armed forces" of Afghanistan for purposes of the Third Geneva Convention of 1949, the President has concluded that the Taliban does not satisfy at least three of the four requirements of lawful combat, and therefore that Taliban fighters are ineligible for treatment as prisoners of war under the Convention. *See Status of Taliban Forces Under Article 4 of the Third Geneva Convention of 1949*, 26 Op. O.L.C. 1, 2-4 (2002).

[14] *See, e.g.*, *United States ex rel. Marks v. Esperdy*, 315 F.2d 673 (2d Cir. 1963), *aff'd by an equally divided court*, 377 U.S. 214 (1964) (expatriation due to service in Fidel Castro's Rebel Army).

for his service as a member of the Romanian army and a guard at concentration camps during World War II, but who subsequently and successfully sought naturalization. Schiffer was born in Philadelphia, Pennsylvania, to non-citizen parents in 1919, but in 1920 he moved with his parents to Moravitz, Romania, where he maintained dual U.S. and Romanian citizenship as a minor. In 1940, he voluntarily presented himself for registration for the Romanian Army, even though Romania did not permit United States citizens bearing dual Romanian citizenship to serve in the Romanian Army. In 1941, he reported for basic training for Romanian Army service and, like his fellow soldiers, swore an oath of allegiance to the Romanian monarch, King Carol II. That December, Romania declared war on the United States. The defendant served in the Romanian Army until 1943. 831 F. Supp. at 1169-71. In 1943, he volunteered to serve in the Waffen-SS Totenkopf Sturmbann (Death's Head Battalion), an elite Nazi force, and like his fellow SS members, swore an oath of allegiance to Adolf Hitler. In that capacity, the defendant served as a concentration camp guard until 1945. As a concentration camp guard, he never requested a transfer or refused any assignment. *Id*. at 1175-76. In 1945, he was captured and held by U.S. Armed Forces as a prisoner of war. The next year, he was discharged as a prisoner of war and arrested by U.S. authorities as a suspected war criminal. He was released in 1947. *Id*. at 1180-81. In 1952, the State Department executed a certificate of loss of citizenship to the defendant. The next year, he obtained an immigrant visa and was admitted to the United States accordingly. *Id*. at 1183-84. In 1958, he applied for naturalization. His application failed to disclose fully, however, his prior service and detention as a suspected war criminal. His naturalization application was approved on the basis of his misrepresentations, and a federal district court issued the defendant a certificate of naturalization. *Id*. at 1184-85.

In 1993, the same district court granted the government's request for an order canceling Schiffer's 1958 naturalization certificate. *Id*. at 1206. The court reasoned that the defendant, a natural born U.S. citizen, had relinquished his citizenship and then procured his naturalization through misrepresentation. Notably, the court justified its expatriation determination by noting that an intention to renounce U.S. citizenship could easily be inferred from the defendant's service in a hostile foreign army at war with the United States:

> We find Schiffer's intent to renounce his United States citizenship was manifested by his conduct prior to and upon entering and serving in the Romanian army and swearing allegiance to King Carol II, his conduct upon voluntarily entering and serving in the *Waffen*-SS and swearing allegiance to Adolf Hitler, and his conduct immediately following the war.

> At least from his teenage years, Schiffer knew that he was an American citizen and, as such, was exempt from military service. . . . Schiffer failed to take any action whatsoever despite knowing that Romania was at war with the United States. *We can think of no conduct more repugnant to an intent to retain American citizenship or more demonstrative of an intent to relinquish American citizenship than voluntary service in the armed forces of a country at war with the United States. . . . Schiffer's conduct in voluntarily joining the Romanian army is so obnoxious to an intent to retain United States citizenship that, in the absence of credible proof to the contrary, we can infer his intent to relinquish his United States citizenship.*

*Id.* at 1194-95 (emphasis added, citations omitted). The court's decision was affirmed on appeal without opinion. 31 F.3d 1175.

The Third Circuit took a similar view of service in a hostile foreign army in *Breyer v. Meissner*, 214 F.3d 416 (3d Cir. 2000). Like Schiffer, Johann Breyer joined the Death's Head Battalion during World War II. *See id.* at 418-19. The court first determined that Johann Breyer was entitled to citizenship at birth. Although he was born in Czechoslovakia in 1925, his mother was an American citizen. At the time, federal law granted citizenship at birth to children born abroad to fathers who are American citizens, but not to children born abroad to foreign fathers and mothers who are citizens of the United States. The court held the law unconstitutional and concluded that Breyer was entitled to citizenship at birth. *Id.* at 429. The court then remanded the case back to the district court to determine whether Breyer remained a U.S. citizen, in light of his activities during World War II. In doing so, the court expressly pointed out that Breyer's decision to join the Death's Head Battalion could constitute a renunciation of American citizenship, *regardless of whether he was even aware of his entitlement to U.S. citizenship at the time*:

> [T]he knowing commitment made by a member of the Death's Head Battalion, during a period when Germany was at war with the United States, demonstrates a loyalty to the policies of Nazi Germany that is wholly inconsistent with American citizenship. Although when he took his oath of allegiance first to the Waffen SS and then to the Death's Head Battalion, Johann Breyer was not aware of his right to American citizenship, one could conclude that he voluntarily made a commitment that, had he known of this right, clearly would have repudiated it. . . . Johann Breyer may have made such a disclaimer of allegiance to the United States by a voluntary enlistment in the Waffen SS and then again in the Death's Head Battalion . . . .

> . . . If these acts were voluntary, . . . the court must determine whether they were performed with an intent to relinquish citizenship. *We conclude that a voluntary oath of allegiance to a nation at war with the United States and to an organization of that warring nation that is committed to policies incompatible with the principles of American democracy and the rights of citizens protected by the American constitution—an organization such as the Death's Head Battalion—is an unequivocal renunciation of American citizenship whether or not the putative citizen is then aware that he has a right to American citizenship.*

*Id*. at 431 (emphasis added). Accordingly, the court remanded the case

> to determine if [Breyer's] actions constitute a voluntary and unequivocal renunciation of any possible allegiance to the United States of America, a renunciation made in a time of war against the United States that demonstrated an allegiance to Nazi Germany and a repudiation of any loyalty—citizen or not—to the United States. *Cf. Perez v. Brownell*, 356 U.S. 44, 68, 78 S.Ct. 568, 2 L.Ed.2d 603 (1958) (Warren, C.J., dissenting and stating that *some actions "may be so inconsistent with the retention of citizenship as to result in loss of that status."*). On remand, the District Court must determine whether Breyer's acts constitute such a renunciation.

*Id*. (emphasis added). On remand, the district court denied Breyer's motion for summary judgment on the issue of voluntariness. *Breyer v. Meissner*, No. CIV. A. 97-6515, 2001 WL 1450625 (E.D. Pa. Nov. 16, 2001). According to the last published court order in the case, trial was set for mid-May 2002. *Breyer v. Meissner*, No. CIV. A. 97-6515, 2002 WL 922160, at *1 (E.D. Pa. May 7, 2002) ("a trial currently is scheduled in this matter for mid-May of this year so that the question of whether Breyer voluntarily relinquished his United States citizenship may be resolved").

In summary, both the Third Circuit and the district court in *Schiffer* (which the Third Circuit affirmed without opinion) have determined that the act of serving in a foreign armed force engaged in hostilities against the United States may itself manifest a specific intention to relinquish U.S. citizenship.

Finally, we must point out that *involuntary* service in a hostile armed force does not constitute grounds for expatriation, because no person can lose his U.S. citizenship "unless he voluntarily relinquishes it." *Terrazas*, 444 U.S. at 260 (quoting *Afroyim*, 387 U.S. at 262). As our Office has noted, "conscription into military service, particularly in a totalitarian country, may make such service and any attendant oath of allegiance involuntary, if the individual would otherwise face physical punishment, imprisonment, or economic deprivation." *Voluntariness*

*of Renunciations of Citizenship Under 8 U.S.C. § 1481(a)(6)*, 8 Op. O.L.C. 220, 229 (1984) (collecting cases). Courts have thus found that certain individuals could not be expatriated on the basis of their conscripted service in a hostile armed force, on the grounds that such service was truly involuntary under the circumstances. *See, e.g.*, *Nishikawa*, 356 U.S. at 136 ("petitioner showed that he was conscripted in a totalitarian country [Japan] to whose conscription law, with its penal sanctions, he was subject"); *Augello v. Dulles*, 220 F.2d 344, 346-47 (2d Cir. 1955) ("fact of the plaintiff's conscription into the Italian army was sufficient proof of duress to preclude a finding that his consequent taking of the oath was voluntary"). *See also Mandoli v. Acheson*, 344 U.S. 133, 135 (1952) (noting Attorney General's conclusion that "[t]he choice of taking the oath or violating the law was for a soldier in the army of Fascist Italy no choice at all") (quotations omitted).

The mere fact of conscription, alone, is not sufficient to defeat the statutory presumption of voluntariness, however. After all,

> military service is frequently performed willingly, freely, even voluntarily, although technically there is no enlistment but conscription under a "compulsory" service law. We are not ready to believe that everyone inducted into an army, a navy, or an air force, performs his service solely because of the proximity of the court martial or the police station. Duress cannot be inferred from the mere fact of conscription.

*Acheson v. Maenza*, 202 F.2d 453, 458 (D.C. Cir. 1953) (footnote omitted). *See also United States v. Ciurinskas*, 148 F.3d 729, 734 (7th Cir. 1998) (holding that an individual who had served in the German Order Police during World War II had done so voluntarily, where there was no evidence that he had been conscripted, and where members of his battalion were permanently released from service upon a written request); *United States v. Stelmokas*, 100 F.3d 302, 313 (3d Cir. 1996) (same). As noted in Part I, the presumption of voluntariness must be rebutted with proof by a preponderance of the evidence that the act of expatriation was in fact performed involuntarily. 8 U.S.C. § 1481(b); *see also Terrazas*, 444 U.S. at 267-70 (upholding voluntariness presumption against constitutional attack).

JOHN C. YOO
*Deputy Assistant Attorney General*
*Office of Legal Counsel*